## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QATAR NATIONAL BANK (QPSC),<br>P.O. Box 1000<br>Doha, Qatar<br><br>       Plaintiff,<br>  v.<br><br>GOVERNMENT OF ERITREA,<br>c/o Minister of Foreign Affairs<br>P.O. Box 190<br>Asmara, Eritrea<br><br>STATE OF ERITREA,<br>c/o Minister of Foreign Affairs<br>P.O. Box 190<br>Asmara, Eritrea<br><br>       Defendants. | No. _____ |

## COMPLAINT

Plaintiff Qatar National Bank ("QNB"), by its attorneys MoloLamken LLP, brings this Complaint against Defendants Government of Eritrea and State of Eritrea (collectively "Eritrea"), alleging as follows:

### NATURE OF THE PROCEEDING

1. This is an action under the District of Columbia's Uniform Foreign-Country Money Judgments Recognition Act of 2011, D.C. Code §§ 15-361 to 15-371, to recognize and enforce a foreign money judgment rendered in the United Kingdom against Eritrea as a result of Eritrea's failure to repay a loan from QNB.

2. On June 27, 2019, the High Court of Justice, Business and Property Courts of England and Wales, entered a final judgment against Eritrea in *Qatar National Bank (Q.P.S.C.)*

*v. Government of Eritrea et al.*, No. BL-2018-000751. A copy of the English court's judgment is attached as Exhibit A, and a copy of the accompanying order is attached as Exhibit B. The English judgment requires Eritrea to pay US$253,388,353.08, plus £70,000 in costs, with interest accruing on both sums at 8% per year.

3. Despite that judgment, Eritrea has refused to pay the amounts it owes. QNB therefore brings this action for recognition and enforcement of the English judgment under the District of Columbia's Uniform Foreign-Country Money Judgments Recognition Act.

## PARTIES

4. Plaintiff Qatar National Bank (QPSC), formerly known as Qatar National Bank, S.A.Q., is a corporation formed under the laws of Qatar, with its principal place of business in Doha, Qatar.

5. Defendant Government of Eritrea is a foreign sovereign.

6. Defendant State of Eritrea is a foreign sovereign.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action against a foreign sovereign under 28 U.S.C. § 1330(a).

8. Eritrea is not entitled to sovereign immunity in this enforcement action because it explicitly waived its immunity from jurisdiction in its Loan Agreement with QNB. Specifically, Section 11 of that agreement provides:

> This Agreement shall be governed by and construed in accordance with the applicable laws, regulations and procedures of the United Kingdom and [ ] the courts of the United Kingdom or any other courts chosen by the Bank shall have jurisdiction to consider any dispute which may arise out of or in connection with this Agreement and Borrower waives his right to object to the jurisdiction of such courts.

9. As reflected in Section 11, Eritrea agreed that the Loan Agreement would be construed in accordance with English law. Under governing English law, Section 11's statement that "any other courts chosen by the Bank shall have jurisdiction to consider any dispute which may arise out of or in connection with this Agreement" constitutes a waiver of immunity from jurisdiction for both the Government of Eritrea and the State of Eritrea. Consequently, Section 11 is an express waiver of immunity under English law (and in the alternative, under United States law). This matter therefore falls within the express waiver exception to immunity set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(1).

10. Alternatively, by agreeing that "the courts of the United Kingdom or any other courts chosen by the Bank shall have jurisdiction to consider any dispute which may arise out of or in connection with this Agreement," Eritrea necessarily agreed that this Court could adjudicate disputes arising out of or in connection with the Loan Agreement, notwithstanding any jurisdictional immunity that would otherwise prevent this Court from exercising jurisdiction. This matter therefore falls within the implied waiver exception to immunity set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(1).

11. This Court has personal jurisdiction over Eritrea under 28 U.S.C. § 1330(b) because Eritrea is a foreign sovereign; it is not entitled to immunity for the reasons set forth above; and it will be duly served as provided by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a).

12. Venue is proper in this district under 28 U.S.C. § 1391(f)(4).

## STATEMENT OF FACTS

### *The Underlying Dispute*

13. This dispute arises out of a Commercial Loan Agreement among Qatar National Bank, S.A.Q., the Government of Eritrea – Ministry of Finance (as borrower), and the State of

Eritrea (as guarantor), dated March 12, 2009. Pursuant to that Agreement, QNB agreed to lend the Government of Eritrea up to US$30 million. Interest on the loan would be calculated at the six-month Libor rate plus 3.25%, along with an additional management fee of 0.3% per year. The Government of Eritrea agreed to repay the loan, along with interest and expenses, in semi-annual installments beginning 36 months from the date of the agreement.

14. In the Loan Agreement, QNB expressly reserved the right to require the Government of Eritrea to repay the full amount of the loan before the end of the contract if necessary. The Government agreed that, if it failed to pay any of the installments when due, it would pay QNB an additional 1% in interest on top of the otherwise applicable rate until the overdue installments were repaid. If the Government missed two or more payments, QNB had the right to demand immediate repayment of the loan.

15. The State of Eritrea guaranteed the Government of Eritrea's obligations under the Loan Agreement. On March 11, 2009, the State of Eritrea executed a written guarantee by which it "vow[ed] to pay the due installments of the USD 30 million loan to Qatar National Bank." The State of Eritrea also signed the Loan Agreement itself in its capacity as guarantor.

16. The following year, on February 17, 2010, QNB, the Government of Eritrea, and the State of Eritrea entered into a Loan Agreement Addendum that modified the original Loan Agreement. That Addendum increased the amount of the loan from US$30 million to US$200 million. Interest would accrue daily at 7% per year. The Government agreed to repay the loan in 11 equal semi-annual installments beginning in November 2011. The State of Eritrea expressly reaffirmed its guarantee.

17. In total, QNB disbursed US$199.5 million to Eritrea pursuant to the Loan Agreement and Addendum.

18. In December 2011, Eritrea repaid US$19,792,527 in principal. In May 2012, it repaid another US$19,792,527 in principal, along with US$5,030,600.57 of interest.

19. After May 2012, however, Eritrea ceased making any payments on the loan.

20. In July 2017, QNB sent Eritrea a written demand for repayment. A few weeks later, QNB sent another written demand for repayment. Eritrea acknowledged both demands in writing. Eritrea did not dispute its liability on the loan or suggest that it had any defense to repayment. Instead, it merely asked QNB to delay taking any enforcement action.

21. Despite QNB's multiple, acknowledged demands for repayment, Eritrea never made another payment on the loan. As of May 10, 2019, Eritrea owed US$159,914,946 in principal and US$92,048,342.14 in interest, for a total of US$251,963,288.14.

*United Kingdom Enforcement Proceedings*

22. Confronted with Eritrea's refusal to honor its obligations, on April 3, 2018, QNB filed a claim for repayment with the High Court of Justice, Business and Property Courts of England and Wales, in the United Kingdom.

23. Under England's State Immunity Act and Civil Procedure Rules, to effect service on Eritrea, QNB was required to have the documents legalized by England's Foreign and Commonwealth Office and then "re-legalized" by the Eritrean Embassy. QNB delivered the necessary documents to the Eritrean Embassy, but the Embassy refused to re-legalize them.

24. QNB then obtained the English court's permission to serve documents on the Eritrean Embassy directly without re-legalizing them. QNB's solicitors sent multiple representatives to the Embassy in an effort to deliver the documents. The Embassy's staff, however, responded with extraordinary efforts to frustrate service. In one instance, the Embassy's receptionist physically assaulted the representative delivering the papers to prevent

her from leaving the documents at the Embassy.  On a second occasion, the receptionist refused to unlock the Embassy door to prevent the representative from exiting the building until he agreed to take the documents back with him.  On a third occasion, the receptionist physically knocked the documents out of a process server's hands and threw them on the pavement outside the Embassy's front door.

25. The English court heard the case on May 10, 2019.  Eritrea refused to appear.  The principal question the court addressed was whether it could dispense with service under the State Immunity Act and Civil Procedure Rules in light of Eritrea's efforts to frustrate service of process.

26. The English court concluded that it did have authority to dispense with ordinary service procedures.  Despite having agreed to jurisdiction in the English courts, it observed, Eritrea had engaged in conduct "designed to delay, frustrate or thwart attempts to serve the court documents."

27. Reviewing the evidence, the English court found no doubt that Eritrea had actual knowledge of the proceedings.  "[T]he Eritrean Government were aware that the Claimant was seeking to commence court proceedings in this jurisdiction and that the Claimant had taken all reasonable steps to put the Defendants on notice of those proceedings . . . ."  As the court observed, the documents were hand-delivered to the Embassy on multiple occasions, and the Embassy was explicitly told that the documents related to court proceedings.

28. Finding "exceptional circumstances," the English court concluded that it was appropriate to dispense with service under the ordinary procedures.

29. The English court then turned to the merits.  The court noted that the evidence established the existence of the loan agreement and guarantee, the sums drawn down, and the

6

limited repayments in 2011 and 2012. It also observed that "the correspondence in 2017 does not identify any suggested defence to the demand for payment and acknowledges the existence of the debt."

30. The court continued: "The Defendants have not participated in this claim to date and have not advanced any defence to the claim in these proceedings. There is no evidence before me of any defence at all let alone one that would have a real prospect of success . . . ."

31. The court concluded that "there is no real prospect of the Defendant successfully defending this claim" and that QNB was therefore entitled to summary judgment.

32. Soon after, on July 2, 2019, the English court issued an order giving effect to its judgment. That order expressly recites that it constitutes a "Final Judgment . . . in favour of the Claimant and against the Defendants." It directs Eritrea to pay QNB the sum of US$253,388,350.08, reflecting the outstanding principal and interest accrued. It also directs Eritrea to pay £70,000 in costs. Both amounts were due within fourteen days, with interest accruing at 8% per year thereafter.

33. The court ordered QNB to send copies of the order to Eritrea's embassies in London and Qatar and to Eritrea's Ministry of Foreign Affairs in Asmara, Eritrea. It gave Eritrea two months to apply to vary or set aside the judgment and stayed enforcement until those two months had passed.

34. QNB served the order on Eritrea as required. The two months elapsed without Eritrea taking any action to move to vary or set aside the judgment. The judgment is accordingly now fully enforceable.

*This Enforcement Action*

35. In the year and a half since the English court entered judgment, Eritrea still has not paid any of the amounts it owes to QNB.

36. With interest, the amount of the English judgment now stands at US$286,123,990.67 as of February 18, 2021.

37. Because of Eritrea's refusal to pay the English judgment, QNB must now search the globe for other assets that could be seized to satisfy Eritrea's debts.

38. Eritrea may have, currently or in the future, assets within this jurisdiction that could be subject to attachment and execution to satisfy its debts.

39. QNB accordingly brings this action for recognition and enforcement of the English judgment.

## COUNT ONE

**RECOGNITION AND ENFORCEMENT OF ENGLISH JUDGMENT**

40. QNB re-alleges the allegations set forth in paragraphs 1 through 39 above as if fully set forth herein.

41. The English judgment is a foreign money judgment entitled to recognition and enforcement under the Uniform Foreign-Country Money Judgments Recognition Act of 2011, D.C. Code §§ 15-361 to 15-371.

42. The English judgment grants recovery of a sum of money, namely US$253,388,350.08 in principal and interest, £70,000 in costs, and interest at 8% per year.

43. The English judgment is final, conclusive, and enforceable against Eritrea under the laws of the United Kingdom.

44. The English judgment does not relate to taxes, fines, or other penalties; divorce, support, or maintenance; domestic relations; or any other matter outside the scope of the Uniform Foreign-Country Money Judgments Recognition Act.

45. No ground for refusing to recognize the English judgment exists. The English judgment was rendered by a judicial system with impartial tribunals and procedures compatible with the requirements of due process of law. The English court had both subject-matter jurisdiction and personal jurisdiction over Eritrea.

46. Eritrea explicitly consented to jurisdiction in the United Kingdom. Although Eritrea refused to participate in the English proceedings, the English court correctly concluded that Eritrea had actual knowledge of the proceedings and that it had engaged in improper measures to avoid service of process. The English court appropriately concluded that English law did not require service pursuant to the procedures of the State Immunity Act and the Civil Procedure Rules under those exceptional circumstances. Eritrea received actual notice of the English proceedings in sufficient time to participate in those proceedings or, at a minimum, to apply to vary or discharge the judgment, but it failed to do so. In those circumstances, the fact that Eritrea refused to participate in the English proceedings is not a bar to recognition or enforcement of the English court's judgment.

47. The English judgment was not procured by fraud. Neither the judgment nor the underlying claim for enforcement is repugnant to the public policy of the District of Columbia or the United States. The English judgment does not conflict with any other judgment, and the English proceedings were consistent with the forum-selection agreement between the parties.

48. The English judgment was not rendered in circumstances that raise any doubt about the integrity of the English court. The proceedings before the English court were compatible with the requirements of due process of law.

49. QNB is therefore entitled to recognition and enforcement of the English judgment.

**PRAYER FOR RELIEF**

WHEREFORE, judgment should be entered in favor of Qatar National Bank (QPSC) and against the Government of Eritrea and the State of Eritrea, jointly and severally, granting the following relief:

a. recognition and enforcement of the English judgment;

b. a money judgment of US$286,123,990.67 plus interest, reflecting all principal, interest, and costs awarded by the English judgment, together with all interest accrued on the English judgment since the date thereof;

c. all other prejudgment and post-judgment interest provided by law;

d. any attorney's fees, litigation expenses, or costs that may be recoverable in this proceeding; and

e. such other and further relief as may be just and proper.

Dated: February 19, 2021
Washington, D.C.

Respectfully submitted,

  /s/ Robert K. Kry
Robert K. Kry
D.C. Bar #490545
Kenneth E. Notter III
(*admission pending*)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2011
Fax: (202) 556-2001
rkry@mololamken.com

*Attorneys for Plaintiff*