# Exhibit A



Neutral Citation Number: [2019] EWHC 1601 (Ch)

Case No: BL-2018-000751

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

7 Rolls Buildings
Fetter Lane, London, EC4A 1NL

Date: 27 June 2019

**Before :**

**MASTER KAYE**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **QATAR NATIONAL BANK (Q.P.S.C)** **(FORMERLY QATAR NATIONAL BANK (S.A.Q))** | **Claimant** |
| - and - | |
| **(1) GOVERNMENT OF ERITREA** **(2) STATEOF ERITREA** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Daniel Saoul QC** (instructed by **Fieldfisher**) for the Claimant
**The Defendants did not appear and were not represented**

Hearing date: 10 May 2019
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

..............................

MASTER KAYE

## Master Kaye:

1.  This is the adjourned hearing of the Claimant's summary judgment application in respect of its claim against the Defendants.

2.  The Claim Form and all subsequent court documents relating to these proceedings including this application had been served on the Defendants by an alternative method pursuant to orders of this court.

3.  The matter was last before me on 8 March when it was adjourned in light of the then recent decision of Lord Justice Males in *General Dynamics United Kingdom Limited v State of Libya [2019] EWHC 64 (Comm)* *("General Dynamics")*. That decision, amongst other matters, raised an issue about the effectiveness of service by an alternative method where a foreign state was concerned.

4.  On 8 April 2019 the Claimant issued an application for permission to dispense with service of the Claim Form. The application was listed to be heard at the same time as the adjourned summary judgment application.

5.  I am told that an appeal is due to be heard in *General Dynamics* in June 2019.

### Background

6.  This is the Claimant's claim arising under a commercial loan agreement between the Claimant and the First Defendant, as borrower. The Second Defendant is the guarantor. The original loan and guarantee were for the sum of US$30m and were dated 12 and 11 March 2009 respectively.  The terms of the loan included a provision for contractual interest and that the loan was repayable on demand (Clause 4c). The loan provided at Clause 11 that the courts of the United Kingdom should have jurisdiction over any dispute arising under the loan agreement and also contained an equivalent governing law clause. The guarantor was jointly and severally liable with the borrower.

7.  The loan was increased to US$ 200m by an addendum dated 17 February 2010. The addendum also increased the contractual interest rate to 7%.   Clause 12 of the addendum confirmed that the terms of the original loan agreement remained valid and in full force and effect as long as they did not contradict the clauses and the conditions of the addendum.

8.  On each of 17 August 2011 and 30 November 2011 the First Defendant made repayments of US$19,792,527.  The First Defendant made a further payment towards interest of US$ 5,030,600.57 on 31 May 2012. No further repayments of capital or interest were made. The Claimant made a written demand for repayment of the loan in accordance with the loan agreement on 5 July 2017 and again on 31 July 2017.  Those demands were acknowledged in writing and the Claimant was asked to delay taking any recovery action.

9.  These proceedings were issued on 3 April 2018. The claim is for repayment of the loan in accordance with its terms. The total sum due to the Claimant as at the date of this hearing is in excess of US$250 million.

### Service on a foreign state

10. The steps that need to be taken to effect service of proceedings on a foreign state are governed by the State Immunity Act 1978 (SIA) and by Civil Procedure Rule ("CPR") 6.44.

11. On 9 August 2018 the Claimant was granted an order giving them permission to serve the Defendants out of the jurisdiction pursuant to the SIA and CPR 6.44.

12. The Claimant sought to take the steps necessary to enable them to serve the Defendants in accordance with CPR 6.44 through the court and Foreign and Commonwealth Office ("FCO"). As the Defendants are not part of the Hague Apostille Convention it was necessary for the court documents to be legalised by the FCO and then to be re-legalised by the Eritrean Embassy in London before the Claim Form could be served in accordance with the SIA and CPR 6.44.

13. The attempts to have the documents re-legalised by the Eritrean Embassy (and to serve the proceedings and other court documents) are set out in the evidence of Mr Austin, Mr Hagemeyer, Mr Carman and Mr Evans. This is summarised at paragraphs 76-101. Those attempts to have the documents re-legalised to enable service to be effected using the diplomatic route were unsuccessful.

14. The Claimant sought and obtained an order for service by an alternative method from Deputy Master Jefferis on 26 October 2018 permitting personal service of the Claim Form and associated documents on the Eritrean Embassy in London. A further order from Deputy Master Bowles on 31 January 2019 permitted service by an alternative method of all other documents in the proceedings including the application for summary judgment by personal service on the Eritrean Embassy in London.

15. The Claimant's evidence sets out the difficulties they experienced when attempting to serve the court documents personally at the Eritrean Embassy. On 21 February 2019 Deputy Master Bowles granted an order permitting service by a different alternative method of first class tracked post to the Embassy in London and email to the personal email of the Ambassador's personal assistant, Ms Teklu.

16. In advance of the hearing listed on 7 March 2019 the Claimant filed evidence confirming that all the documents relating to the proceedings including the Claim Form and the application for summary judgment had been served in accordance with the various orders for alternative service.

### Was service of the Claim Form by an alternative method valid?

17. Service of court proceedings on a foreign state is governed by section 12 SIA which provides so far as is relevant:

> "(1) Any writ or other document **required to be served for instituting proceedings** against a State shall be served by being transmitted through the Foreign and Commonwealth Office to the Ministry of Foreign Affairs of the State and service shall be deemed to have been effected **when the writ or document is received at the Ministry**. (my emphasis)

(2) Any time for entering an appearance (whether prescribed by rules of court or otherwise) shall begin to run two months after the date on which the writ or document is received as aforesaid.

...

(4) No judgment in default of appearance shall be given against a State except on proof that subsection (1) above has been complied with and that the time for entering an appearance as extended by subsection (2) above has expired.

(5) A copy of any judgment give against a State in default of appearance shall be transmitted through the Foreign and Commonwealth Office to the Ministry of Foreign Affairs of that State and any time for applying to have the judgment set aside (whether prescribed by rules of court or otherwise) shall begin to run two months after the date on which the copy of the judgment is received at the Ministry.

(6) Subsection (1) above does not prevent the service of a writ or other document in any manner to which the state has agreed and subsections (2) and (4) above do not apply where service is effected in any such manner ... ."

18.    CPR 6.44 provides:

(1) This rule applies where a party wishes to serve the claim form or other document on a State.

(2) In this rule, 'State' has the meaning given by section 14 of the State Immunity Act 1978.

(3) The party must file in the Central Office of the Royal Courts of Justice –

(a) a request for service to be arranged by the Foreign and Commonwealth Office;

(b) a copy of the claim form or other document; and

(c) any translation required under rule 6.45.

(4) The Senior Master will send the documents filed under this rule to the Foreign and Commonwealth Office with a request that it arranges for them to be served.

(5) An official certificate by the Foreign and Commonwealth Office stating that a claim form or other document has been duly served on a specified date in accordance with a request made under this rule is evidence of that fact.

19.     The Claimant obtained an order permitting service out of the jurisdiction in
        accordance with the SIA and CPR 6.44.  Attempts to serve the Claim Form in
        accordance with section 12 SIA and CPR 6.44 within the validity of the Claim Form
        were not successful because of the need for the Claim Form and other documents
        which were required to be served to be re-legalised by the Eritrean Embassy in
        London before the FCO would arrange for service through the diplomatic route.

20.     Section 12 SIA is mandatory in its language.  Males LJ in *General Dynamics* having
        considered both *Westminster City Council v Government of the Islamic Republic of
        Iran* [1986] 1 WLR 979 ("*Westminster*") and *Kuwait Airways Corporation v Iraqi
        Airways Co* [1995] 1 WLR 1147 (*"Kuwait Airways"*) concluded that it is not possible
        to serve a Claim Form on a foreign state by an alternative method given the
        mandatory nature of the language in section 12 SIA.

21.     The House of Lords in *Kuwait Airways* approved the statement by Evans J at first
        instance that

                " In my judgement, the requirement of service at, not merely
                "on" the Foreign Ministry of the Defendant State is no less than
                the plain words of section 12 (1) demands.  Service is effected
                by transmission to the Ministry and takes effect when the
                document is received at the Ministry.  In no sense is a
                diplomatic mission in a foreign State the same as the Ministry
                of Foreign Affairs of the sending state."

22.     Following those authorities, I agree that the mandatory wording of section 12 is such
        that where there is a document that is required to be served under section 12 (1)
        service by an alternative method is not available.

23.     Mr Saoul QC accepted that on the current state of the law it was likely that service of
        the Claim Form by an alternative method was not valid. I find that following *Kuwait
        Airways* service by an alternative method on the Eritrean Embassy in London was not
        valid service.

24.     These cases do not directly address the question of whether service of Claim Form
        can be dispensed with under the CPR as they pre-date the introduction of the power to
        dispense with service.

25.     However, in *General Dynamics* Males LJ found that it was equally not possible to
        dispense with service of the Claim Form on a foreign state as that would also be
        contrary to the mandatory terms of section 12 SIA.  He commented that it would be
        "*odd if the even more radical step of dispensing with service altogether was
        available.*"

26.     He acknowledged that the opposite conclusion had been reached in three recent
        decisions of the Commercial Court but declined to follow those decisions
        commenting that the cases were recent, their reasoning was brief, the Defendant states
        were not represented and the Judges had not been referred to the Singapore decision
        of *Van Zyl v Kingdom of Lesotho* [2017] SGHC 104 ("*Van Zyl*").  They could not
        therefore be regarded as a settled line of authority.

Qatar National Bank v Government of Eritrea et al

27.     In light of the disagreement in the first instance authorities as to whether the court
        does have power to dispense with service of a claim form on a foreign state Mr Saoul
        QC submits that the decision of Males LJ in *General Dynamics* is not binding on this
        court and it is open to this court to follow the alternative line of authorities namely
        Andrew Henshaw QC sitting as a Deputy High Court Judge in *Certain Underwriters
        at Lloyd's of London v Syrian Arab Republic* [2018] EWHC 385 (Comm) *("Syrian
        Arab Republic"),* Teare J in *Havlish v Islamic Republic of Iran* [2018] EWHC 1478
        (Comm)*("Islamic Republic of Iran")* and Teare J in  *General Dynamics United
        Kingdom Limited v State of Libya* [2018] EWHC 1912 (Comm*) ("General Dynamics
        WN").*

28.     The CPR contains provisions enabling the court to dispense with service of the Claim
        Form in exceptional circumstances (CPR 6.16) These provisions do not apply where
        any enactment makes different provision, that is that the statutory provisions trump
        the CPR.

29.     An application pursuant to CPR 6.16 can be prospective or retrospective and can be
        made without notice.  Where the application is made retrospectively, that is after the
        expiry of the Claim Form, as here, it should not be used to circumvent limitation
        provisions or circumvent restrictions on the power to extend the time for service of a
        Claim Form.    Here the demands for repayment under the commercial loan
        agreements, the subject of these proceedings, were not made until 2017 so limitation
        issues would not arise.  Exceptional circumstances on a retrospective application
        would have to be supported by evidence of the attempts to serve the Claim Form.

30.     No application has been made to dispense with service of other court documents
        pursuant to CPR 6.28.  Mr Saoul QC submits that following  Bryan J in *The European
        Union v Syrian Arab Republic* [2018] EWHC 1712 (Comm) (*"European Union")* at
        paragraphs 38 to 41 as referred to by Males LJ in *General Dynamics,* CPR 6.44 and
        the mandatory requirements of section 12 (1) SIA only apply to service of documents
        instituting proceedings.  The orders for, and service by, an alternative method of all
        the other court documents including the application for summary judgment remain
        valid. There is therefore no need to ask this court to make any order in relation to the
        other court documents.

31.     The questions that need to be determined on this application are:

        i)      Does the Court have Power to Dispense with Service of the Claim Form in a
                claim against a foreign state (CPR 6.16)?

        ii)     If so, are there exceptional circumstances as required by CPR 6.16 that justify
                exercising that power in this case in relation to the Claim Form?

        iii)    If the answer to those questions is in the affirmative and the court exercises the
                power to dispense with service of the Claim Form:

                a)      Should the court give the Claimant permission to pursue a summary
                        judgment application in the absence of an acknowledgement of service,
                        and  if so,

                b)      Is the Claimant entitled to summary judgment on their claim?

## The Defendants

32. Neither of the Defendants was present or represented at the hearing. Adopting the same approach as Andrew Henshaw QC in *Syrian Arab Republic* and having also been referred to the decision of the Court of Appeal in *R v Haywood, Jones and Purvis* [2001] EWCA Crim 168, I was satisfied that it was appropriate to proceed with the application.

33. In reaching that conclusion I note the following:

   i) The Claimant has provided the Defendants, through their Embassy in London, not only with the Claim Form, but all the documents, applications, Orders, bundles and the skeleton for this hearing. In some cases those documents have been provided several times.

   ii) The Claimant had obtained Orders which said that service was permitted by an alternative method. The Claimant's evidence is that the Embassy staff were told the documents were court documents and that they were being served. Whilst those Order for service of the Claim Form was not effective I am satisfied that the Defendants had been given ample opportunity to participate and attend the hearing.

   iii) The Claimant's evidence sets out the steps they took to bring the proceedings, orders and this application to the attention of the Defendants and the response from the Embassy. I am satisfied that the Defendants are aware of these proceedings.

   iv) I have regard to the overriding objective and the need to deal with cases justly and proportionately. I also take into account the need to ensure that cases are dealt with expeditiously and fairly.

   v) These proceedings were issued on 3 April 2018 over a year ago. This is the adjourned hearing of this application for summary judgment not the first hearing. Although there has only been one earlier hearing, five orders have been made relating to service over a period of six months requiring the court to consider on paper several applications and seven witness statements.

   vi) Although the claim is substantial there is no good reason to delay these proceedings further.

   vii) The Defendants have not participated in the claim to date and there is no reason to think that they would do so if there were another adjournment.

   viii) In making his submissions that the court should not follow the decision of Males LJ in *General Dynamics* but the competing lines of authority Mr Saoul QC has drawn to my attention in detail Males LJ's decision and authorities which are adverse to the Claimant's position and which would support the arguments that might be available to the Defendants on the issue of service.

**Does the Court have Power to Dispense with Service of the Claim Form in a case against a foreign state?**

34.    The decision in *General Dynamics* related to an application to enforce an ICC arbitration award made in January 2016. Libya had been legally represented and had participated throughout the ICC arbitration. An application to enforce in England and Wales and to dispense with service initially came before Teare J on a without notice basis. It was a prospective application made in advance of service. By the time the application came before Teare J there were said to be different entities purporting to be the Government of Libya.

35.    Based on the evidence before him Teare J found that an order dispensing with service was not in conflict with section 12 SIA. He directed that service be dispensed with and further directed that the proceedings be brought to Libya's attention (not by way of service) using a number of different methods.    The Order made in those proceedings is set out in Males LJ's judgment at paragraph 7. The Order provided a period of two months in which Libya could challenge the decision to dispense with service. Libya, within time, applied to set aside the Order dispensing with service.

36.    There were three issues before Males LJ.

       i)      Whether section 12 SIA applied at all – the Claimant said that there was no document that was required to be served pursuant to section 12 SIA and it did not therefore apply.

       ii)     If a document did have to be served pursuant to section 12 whether there was power to dispense with service

       iii)    And if so, should he exercise it.

37.    Each of *General Dynamics, Syrian Arab Republic* and *Islamic Republic of Iran* concern the enforcement of either a foreign judgment or arbitral award. Males LJ's concern in *General Dynamics* was the identity of the document to be served at the commencement of the process given the nature of the proceedings. Here there is no doubt about the document to be served, it is an English Claim Form to which section 12 SIA applies. The question for this court is whether there is power to dispense with service without offending the mandatory requirements of section 12.    That is an important distinction.

38.    At paragraphs 21(3) and 22(3) of *General Dynamics* Males LJ records that leading counsel for both the Claimant and the Defendant accepted that the court had power to dispense with service of the Claim Form in exceptional circumstances. Mr Saoul QC says that in those circumstances it is not clear the extent to which the question of the power to dispense was argued before Males LJ as it was not a point taken against the Claimant by Libya.

39.    The Claimant argues that if the court has no power to dispense with service of the Claim Form against a foreign state it would enable foreign states to deprive claimants of their remedy even where the foreign state have chosen, through commercial agreements they have entered into, to confer exclusive jurisdiction on the UK courts, as they have in this case.

40.     A Defendant foreign state could obstruct service via the diplomatic route simply by refusing or failing to take the necessary steps to allow service to be effected by the diplomatic route in accordance with CPR 6.44 as here. This issue simply did not arise in *General Dynamics*.

41.     Here the FCO had confirmed, to the Claimant's legal team, that as Eritrea was not part of the Hague Apostille Convention, in order to serve a Claim Form on the Defendants, the Eritrean Government required the court documents to be legalised by both the FCO and the Eritrean Embassy in London before the documents could then be sent to the British Embassy in Asmara, Eritrea for the British Embassy to then serve them on the Ministry of Foreign Affairs of Eritrea.

42.     The Eritrean Embassy has not re-legalised the court documents. The Claimant therefore cannot effect service through the diplomatic route. Put simply the Claimant says it cannot be right that section 12 SIA together with CPR 6.44 are to be interpreted in such as way as to deprive the Claimant of any remedy. They say that it cannot have been the intention of parliament, is not the correct interpretation of what is required by the section 12 SIA, and, would not be in the spirit of the overriding objective.

43.     At paragraph 46 of *General* Dynamics Males LJ says that to find that the Court had power to dispense with service of a Claim Form against a foreign state would be *"Contrary to the clear and mandatory terms of section 12 read with section 1"*

44.     Males LJ's reasoning includes at paragraph 27: *"It is at least a reasonable inference that the section contemplates that there will always be some document required to be served for instituting proceedings against a State."*

45.     And at paragraph 28 *"there is nothing in the section itself to suggest that service by any other method than through the Foreign & Commonwealth Office is permitted, let alone that service of court proceedings on a Defendant State is not necessary at all. While it is true that if the court has and exercises a power to dispense with such service there is no document required to be served, that seems an altogether too easy way to avoid the need for service through the Foreign & Commonwealth Office."*

46.     *"...at the date of the State Immunity Act 1978 the court had no power to dispense with service ... Accordingly Parliament would not have contemplated that proceedings could be instituted against a Defendant state without service."*

47.     He continues at paragraph 29 that section 12 SIA *"requires that service should be effected diplomatically in both senses of the word. That ensures appropriately respectful dealings between sovereign states and gives to the executive which is responsible for the conduct of this country's international relations a legitimate role in deciding whether, when and how a foreign state should be made subject to the jurisdiction of the English courts... If the court is able to bypass section 12 by dispensing with service, this safeguard for the conduct of international relations is illusory."*

48.     Mr Saoul QC argues that the wording of section 12 (1) "Any writ or other document **required to be served for instituting proceedings** against a State" (my emphasis) cannot be read as always requiring service through the FCO. The wording is

sufficiently broad on its natural meaning to accommodate a situation in which no document is required to be served to institute proceedings. He argues that if service has been dispensed with then there is no document to be served and section 12 SIA is simply not engaged at all.

49.   This was the reasoning adopted by Andrew Henshaw QC in *Syrian Arab Republic* (paragraph 25) where he said " *If exceptionally, the court has made an order dispensing with service of the Claim Form instituting the proceedings, then it is not a document "required to be served" within section 12. "*

50.   This reasoning was followed by Teare J in *Islamic Republic of Iran.* Having referred to paragraph 25 and 28 of *Syrian Arab Republic* he continued at paragraph 21 *"In considering the exercise of the court's discretion in the present case...there must be put in the balance.... That a refusal to grant relief sought by the Claimants would deprive the Claimants of any recourse in the proceedings and allow the Defendants to avoid the proceedings without any substantive basis for doing so. It is said that this would "effectively grant the Defendants absolute immunity from suit."....refusing the Claimants the relief sought may deprive the Claimants of any recourse before the English Courts. "*

51.   Mr Saoul QC submits that this reasoning should be preferred and fully respects and applies the wording of section 12 (1) SIA.

52.   He argues that to adopt the reasoning of Males LJ requires the court to import into section 12 SIA a much narrower interpretation than the natural meaning of the words. It requires one to start from the premise that there will always be some document required to be served to institute proceedings. Males LJ acknowledged that he reached that conclusion by "*reasonable inference*".

53.   In order to reinforce his analysis Males LJ relied on his interpretation of the interaction between subsections (4) – (6) and subsection (1) of section 12. I do not agree with his analysis.

54.   Subsection (4) (paragraph 17 above) concerns the need to show compliance with subsection (1) in order to obtain judgment in default. In my view, if the court has dispensed with service of the Claim Form no document would be required to be served under sub-section (1). It would therefore be possible to comply with sub-section (1) for the purposes of obtaining a default judgment and to meet the requirements of sub-section (4).

55.   Sub-section (5) relates to the service of the default judgment and the time period for applying to set it aside. This does not preclude the power to dispense with service of a Claim Form nor does it preclude a Claimant from obtaining a default judgment under subsection (4).

56.   Sub-section (6) provides for an alternative or additional means of service as agreed with the Defendant Foreign state. I do not accept that this supports the argument that service cannot be dispensed with. It is always open to parties to any dispute to agree an alternative method of service and sub-section (6) is an enabling provision for that purpose.

57. Whilst interpretation of a statute requires one to respect the wording it should be interpreted purposefully so as not to reach an absurd outcome and be construed in the current sociolegal context. In construing the meaning of section 12 SIA I have to have regard to the sociolegal context in 2019. The SIA is not frozen in time in 1978.

58. There was no power to dispense with service of a Claim Form in 1978 but that is far from determinative. The power to dispense with service was introduced through the CPR. It is suggested by Mr Saoul QC that one of the reasons for its introduction was to address the difficulties presented by Defendants who sought to avoid or frustrate attempts to serve proceedings on them. He submits that it would be an absurd position if a foreign state was able to shelter behind section 12 SIA and frustrate service so as to avoid its legal obligations in a way no other type of Defendant is now entitled to do.

59. In *General Dynamics* Males LJ was concerned about diplomatic relations and respectful dealings between sovereign states but he was not confronted with a Defendant who had not co-operated or participated in the legal process. In *General Dynamics* the Defendant had participated in the underlying arbitration claim. The issue that Males LJ was addressing arose from the unusual situation where there were two different entities purporting to be the Government of Libya. As I have noted at paragraph 38 both leading counsel in General Dynamics submitted there was power to dispense with service in any event.

60. Here, the situation is one where a foreign state's non-co-operation with its own procedure can frustrate the process envisaged by section 12 SIA. I cannot accept that Parliament would have intended to legislate in such a way that a Defendant foreign state could frustrate service and avoid its legal obligations altogether.

**European Convention on State Immunity 1972 ("the Convention")**

61. At paragraphs 40 – 44 Males LJ prays in aid of his construction of section 12 SIA Article 16 of the Convention to support his conclusion that had Parliament meant to provide the court with a power to dispense with service it would have done so.

62. The wording of Article 16 of the Convention is narrower than section 12 SIA. Parliament has chosen to use a different and arguably wider and less prescriptive wording in section 12 SIA. I note that, the SIA is not limited to those states who have signed up to or ratified the Convention.

63. The Convention is voluntary and individual states must ratify and accede to the Convention. Eritrea is not a signatory to the Convention and has not ratified it.

64. In my judgment the SIA should not be interpreted simply by reference to the Convention. Given its broader reach applying to non-Convention states as well as Convention states it cannot be assumed that Parliament intended a narrower wording than the natural meaning provides. The Convention does not apply in this case in any event.

Van Zyl

65.     It is necessary to consider one further authority relied on by Males LJ, *Van Zyl,* which
        he says is supportive of the decision he reaches in relation to section12 SIA and the
        absence of a power to dispense with service.   Males LJ notes that S14 of the
        Singapore State Immunity Act was modelled on section 12 SIA.  As with the English
        authorities *Van Zyl* related to enforcement in that case, of an arbitration award.

66.     *Van Zyl* was, in fact, focussed on the question of whether there was a document that
        was required to be served rather than a decision about whether the court had the
        power to dispense with service.  The decision in *Van Zyl* at paragraphs 41 – 49 is a
        consideration of what document was required to be served to institute the enforcement
        proceedings, whether such document had been served and the time for response.  I do
        not know whether there is, in fact, power to dispense with service as a matter of
        Singapore civil procedure but there was no consideration of whether there was such
        power in *Van Zyl*.  It does not therefore provide assistance on the question of the
        power to dispense with service of the Claim Form.

67.     Males LJ was concerned that an order dispensing with service would make it too easy
        to avoid the requirements of service through the FCO.  Kannen Ramesh J in *Van Zyl*
        supports the broader policy concerns raised by Males LJ about the approach to and
        treatment of proceedings against foreign states.

68.     The court will need to be satisfied about the steps taken by the serving party to put the
        Defendant on notice of the claim and why service could not be effected by the
        diplomatic route.  This will include consideration of the conduct and approach of the
        proposed Defendant foreign state.   In considering whether there are exceptional
        circumstances the court can take into account all the circumstances including the need
        for respectful dealings between foreign states.

69.     For the reasons set out above I do not agree with Males LJ analysis of the application
        of section 12 SIA in *General Dynamics.* I prefer the alternative line of authorities and
        the analysis of Teare J and Andrew Henshaw QC in *Syrian Arab Republic* and *Islamic
        Republic of Iran* as followed by Teare J in *General Dynamics WN*.

70.     I find that the natural meaning of the words "required to be served" in section 12 SIA
        when interpreted purposefully and in the legal and social context of 2019 are
        sufficiently broad to accommodate a situation where there is no document that is
        "required to be served" to institute proceedings.  Neither Article 16 of the Convention
        nor Kannen Ramesh J's decision in Van Zyl preclude that conclusion.  The wording
        of section 12 SIA does not, on analysis, therefore, preclude the exercise of the courts
        power to dispense with service in an appropriate case.

71.     Males LJ's concerns about extended time periods for responding to claims can be
        adequately dealt with by appropriate case management orders.  They are not a bar to
        dispensing with service. The overriding objective and the court's case management
        powers are sufficiently flexible and broad to adapt to such circumstances and the
        court has a wide discretion to ensure that parties are treated fairly and justly.

### Should the power to dispense with service be exercised?

72. Having found that the court has power to dispense with service of a Claim Form against a foreign state the court must next consider whether it should do so. In relation to a Claim Form that requires a consideration of whether there are exceptional circumstances such that the power to dispense with service should be exercised in favour of the Claimant in this case (CPR 6.16).

73. In *General Dynamics* counsel for the Defendant suggested that the test of exceptional circumstances included a requirement that the serving party provide cogent evidence of the impossibility of service. Males LJ did not accept that submission and commented at paragraph 83:

> "There is in my judgment no need to gloss the expression "exceptional circumstances" in this way. It is a broad and flexible test which should not be unduly complex to apply and should not be rigidly circumscribed."

74. However, when considering whether there are exceptional circumstances such that the court should exercise the power to dispense with service of the Claim Form against a foreign state the court should be slow to find that there are exceptional circumstances, particularly where the Defendant foreign state, by the nature of the application, is unlikely to be participating in that application.

75. The court should consider if there is a good reason why the Claimant should not be required to serve by the diplomatic route. This requires consideration of the evidence of the steps taken by the serving party to effect service as well as consideration of the conduct of the foreign state to be served.

76. The witness statements of Mr Hagemeyer of 25 October 2018, Mr Austin of 28 January 2019, Mr Hagemeyer of 19 February 2019 exhibiting the witness statements of both Mr Evans of 14 February 2019 and Mr Carman of 19 February set out the steps taken to seek to effect service on the Defendants and the difficulties that were experienced by the Claimant.

77. On 9 August 2018 pursuant to CPR 6.44, the Claimant obtained an Order giving an extension of time for service of the Claim Form and permission to serve the Claim Form and associated documents on the Defendants pursuant to the SIA.

78. On 30 August 2018 the FCO confirmed that in order to serve documents in Eritrea the Claimant would need to do the following:

i) make an application to court for permission to serve the Claim Form and associated documents on the Defendants in accordance with the provisions of section 12 SIA (a step which had by then already been taken by the Claimant);

ii) certify all documents which the Claimant was seeking to serve on the Defendants;

iii) have all the documents which the Claimant was seeking to serve legalised by the FCO; and

iv)   have all the documents which the Claimant was seeking to serve re-legalised by the Embassy of Eritrea in London.

79.  Once those steps were completed the documents should then be provided to the FCO for service out of the jurisdiction via the British Embassy in Eritrea.

80.  The FCO legalisation process was completed in September 2018.

81.  The Claimant's witness evidence sets out the steps they took to seek to have the documents re-legalised by the Eritrean Embassy.

82.  Mr Hagemeyer explains that he arranged for his colleague Niloufar Yekta to attend the Embassy with the relevant documents on 26 September 2018. She provided the documents to the receptionist who initially indicated that she should wait for the documents to be legalised but who returned 15 minutes later to ask Ms Yekta to return to collect the documents on 28 September 2018 as there were too many to be legalised that day. The receptionist confirmed that the cost of the service would be £2,250 and that the only acceptable payment method was cash. There was no suggestion that the documents would not be legalised by the Eritrean Embassy.

83.  Mr Hagemeyer and Ms Yekta attended the Embassy on 28 September 2018 and were invited to a meeting room by Yohanna Paulos Teklu who introduced herself as the personal assistant to the Ambassador. She provided her business card with her personal contact details including email address. She questioned why the Embassy was being asked to re-legalise documents that had not originated in Eritrea. Mr Hagemeyer explained that this was a requirement in order to enable the Claimant to serve court documents. Ms Teklu asked that he seek clarification from the FCO and then confirm position to her by email.

84.  The FCO confirmed that the reason the documents needed to be re-legalised by the Eritrean Embassy was because Eritrea was not part of The Hague Apostille Convention. The requirement that the documents be re-legalised was a requirement of the Eritrean Government not the FCO.

85.  Mr Hagemeyer emailed Ms Teklu on 28 September 2018 to confirm the position and followed up with phone calls on 28 September, 1 October, 3 October, and 4 October. On 4 October Mr Hagemeyer was advised that Ms Teklu was out of the country. The Claimant's solicitors wrote to the Eritrean Embassy on 8 October 2018 repeating its formal request for re-legalisation of the documents.

86.  On 11 October 2018 Ms Teklu emailed the Claimant's solicitors to advise them that she was liaising with the relevant authorities in Eritrea on how to deal with the matters and was waiting for instructions from the Ministry.

87.  The FCO re-confirmed their requirements in writing on 16 October 2018. The Claimant's solicitors therefore wrote again to the Embassy on 16 October 2018 explaining that if the Embassy could not assist to enable the FCO diplomatic service procedure to be adopted that the Claimant's solicitors would apply for service by an alternative means. The Eritrean Embassy did not respond to that letter and email. The evidence confirms that the email was received and opened.

88.   The Claimant applied for service by an alternative method such that they could serve the Claim Form and associated documents on the Defendants by effecting personal service on the Eritrean Embassy in London. They were not aware and so did not make the Deputy Master aware that service of a Claim Form by an alternative method was not valid on a sovereign state.

89.   By order dated 26 October 2018 Deputy Master Jefferis made an order giving permission to serve the Claim Form and Particulars of Claim by personal service on the Eritrean Embassy. The time for service of any Acknowledgment of Service, Admission or Defence was extended to 22 days and 36 days from the date two calendar months after the date of deemed service to comply with the extended time periods for responding to claims set out in the SIA.

90.   Mr Austin explains that armed with the Order for service by an alternative method Ms Yekta attended the Eritrean Embassy in London on 29 October 2018 at approximately midday.

91.   Mr Austin records what Ms Yekta told him about her visit. She was greeted by the receptionist who identified herself as Mrs Hayat. After she had explained she had court documents to serve on the Embassy Mrs Hayat allowed Ms Yekta into the Embassy and took the documents from her. She took the documents into another room and after approximately 10 minutes returned with documents and said that the Embassy could not accept them without instruction from the Eritrean Government. Ms Yekta explained that the Claimant had a court order permitting them to serve documents on the Embassy.

92.   Mrs Hayat again took the documents into another room and then returned and said again they could not accept the documents. Miss Yekta was asked to take the documents back and return a week later. She refused and sought to leave the Embassy leaving the documents behind. She was pursued by Mrs Hayat asking her to take the documents back and at one stage says her arm was grabbed by Mrs Hayat and she was pulled back into the Embassy. She left the Embassy leaving the documents behind but upon looking back saw that Mrs Hayat had dropped the documents onto the floor by the Embassy door.

93.   The Claimant was satisfied that they had effected service and deemed service was 31 October 2018. They filed certificates of service with the court.

94.   The 26 October 2018 order had been limited to service of the Claim Form. The Claimant therefore sought a further broader order for permission to serve all other documents in the proceedings by the same alternative method. By order of Deputy Master Bowles dated 30 January 2019 the Claimant was given permission to serve its summary judgment application notice and supporting documents together with any future documents relating to the claim on the Eritrean Embassy in London.  .

95.   Mr Hagemeyer, Mr Carman and Mr Evans in their witness statements dated 19 February 2019, 19 February 2019 and 14 February 2019 respectively provide their evidence of what happened in relation to service of the summary judgement application and subsequent documentation.

96.    Mr Carman explains that he attended the Eritrean Embassy on 5 February 2019 in order to serve three copies of the application notice and all the accompanying documents identified in his statement including the orders permitting alternative service.

97.    He arrived at the Embassy at approximately midday and was greeted by the receptionist. He gave the receptionist Ms M.A. Adhanom two sealed envelopes. She picked up the envelopes and asked what they contained. Mr Carmen informed her that they were court documents being served by the Claimant's solicitors. The receptionist went to discuss the documents with a colleague. She returned and informed Mr Carman that the Embassy was unable to take receipt documents and sought to hand them back to him. He refused to accept the documents and explained that the Embassy was the right place for service of the documents and that having handed them to her that was sufficient for service.

98.    Mr Carman describes the receptionist as becoming frustrated and hostile. She indicated to the exit buzzer next to the front door and said that she would not let Mr Carman leave the Embassy until he took the documents back. She placed the documents on a radiator behind him and closed the door to the main waiting area. Speaking from behind the security screen at the front desk she repeated her threat that she would not let him leave the Embassy unless he took the documents with him.

99.    In light of the threat to prevent Mr Carman from leaving the Embassy until he took the documents, he left the Embassy at approximately 12.22pm.

100.   The Claimant's solicitors then instructed Mr Evans, a process server, to effect personal service of the application notice and associated documents on the Eritrean Embassy. Mr Evans explains that he personally served the Defendants with each of the documents identified in his witness statement at 15.58pm on 7 February 2019 by leaving them at the Embassy in presence of an adult female receptionist who would not give him her name. He explains that the receptionist refused to physically take the documentation from him at which point he attempted to leave them at the Embassy in her presence by placing them in the reception area. He says she knocked the documentation from his hands and it landed on the floor inside the Embassy at which point she picked it up and threw it through the open door onto the pavement outside the Embassy. He then left the Embassy leaving the documentation on the floor and stationed himself a short distance away from the Embassy. He confirms that he observed the same receptionist exit the Embassy at 16:03 hours and retrieve all sets of the documentation from the pavement and take them back inside the Embassy.

101.   In light of the difficulties experienced by Mr Carman and Mr Evans in seeking to effect service of documents on the Eritrean Embassy a further application was made to the court for permission to serve documents by a different alternative method. By order dated 20 February 2019 Deputy Master Bowles made an order permitting service of the application notice dated 19 February 2019 and all supporting evidence and any other documents relating to the proceedings by an alternative method namely by first-class tracked post to the Eritrean Embassy or by email to the ambassador's personal assistant.

102.   From this evidence it appears:

i)      The staff at the Eritrean Embassy were told there were proposed court proceedings.

ii)     They examined the documents on a number of occasions, although it is not clear from the evidence the status of those who examined them, it appears to have included the Ambassador's personal assistant.

iii)    The Ambassador's personal assistant attended a meeting to discuss the court documents and why the documents needed to be re-legalised, asking the Claimant to seek confirmation from the FCO.

iv)     In October 2018 the Ambassador's personal assistant confirmed she was liaising with the authorities in Eritrea in relation to the court proceedings and was awaiting instructions from the Ministry.

v)      The court documents were personally delivered to the Eritrean Embassy on a number of occasions. Each of Mr Hagemeyer, Ms Yekta and Mr Carman say that they made it clear that the documents were court documents.

vi)     Both Mr Hagemeyer and Mr Carman say they made it clear the documents were being delivered by way of service.

vii)    The court documents were subsequently posted to the Eritrean Embassy and further documents were sent to the Eritrean Embassy including the bundle for this hearing, the skeleton argument and the application to dispense with service.

103.    The Defendant has not participated in these proceedings so has not filed any counter evidence. I take that into account when assessing the evidence.

104.    Whilst the court's discretion to dispense with service is unfettered exceptional circumstances need to be demonstrated before the Court could or should dispense with service of a Claim Form. As Lord Justice Males said at paragraph 83 of *General Dynamics* referred to at paragraph 80 above "it is a broad and flexible test which should not be unduly complex to apply and should not be rigidly circumscribed".

105.    However, the court should be slow to exercise the power to dispense with service where a foreign state is involved. Where possible and in keeping with spirit and the intention of section 12 SIA and CPR 6.44 service should be effected through diplomatic channels.

106.    Males LJ identified section 12 SIA as an important safeguard for the conduct of international relations and Defendant foreign states. However, the need for respectful dealings between sovereign states is not one-sided and cannot have been intended to be one-sided.

107.    In order for there to be respectful dealings between sovereign states in relation to the administration of court process, sovereign states need to ensure that they do not take steps to thwart the proper administration of court processes in other foreign states.

108.    Eritrea is not part of the Hague Apostille Convention. It was therefore, for them to agree the process by which documents should be served on the foreign state. The

FCO confirmed that it is the Eritrean Government's own requirement that any court documents be re-legalised by the Eritrean Embassy.

109.    Where for a Claimant to comply with section 12 SIA and CPR 6.44, it required the foreign state, here the Eritrean Government, to itself, re-legalise the court documents needed for service of process upon it (to enable service to take place through the diplomatic route), it is incumbent upon that foreign state to ensure it has in place an appropriate process for doing so, so as not to thwart or frustrate the proper administration of justice in another sovereign state.

110.    The Claimant sought to engage with the Eritrean Embassy to effect service at all stages of the process. They attended at the Embassy to have the documents re-legalised and explained why it was necessary.  They obtained confirmation from the FCO of the need for re-legalisation at the request of Ms Teklu, the Ambassador's personal assistant. As long ago as October 2018 she told the Claimant's that she was awaiting instructions from the Ministry in Eritrea about how to deal with matters. Subsequently the Embassy staff when told that the documents were court documents refused to accept them having examined them.

111.    This conduct appears to be designed to delay, frustrate or thwart attempts to serve the court documents.  It should be considered against the background of the Defendants having entered into substantial commercial loan and guarantee agreements with the Claimant under which they had drawn down US$199,500,000. Those commercial agreements specifically conferred jurisdiction on the United Kingdom as being the appropriate forum to resolve disputes arising out of those commercial agreements. The conduct described in the evidence frustrated any attempt to enable the documents to be served through the FCO diplomatic process to allow that process to commence.

112.    In this case the underlying dispute had not already been determined by arbitration or proceedings in another jurisdiction unlike *General Dynamics Syrian Republic* and *Islamic Republic of Iran*.  This was not proceedings for the purpose of enforcement of a pre-existing final award or decision.

113.    In my view the position is qualitatively different when one is considering a Claim Form and the commencement of process where the parties, even if one is a foreign state, have chosen this jurisdiction as the forum for resolving disputes and one party seeks to thwart and frustrate any attempt to commence that process.

114.    As Teare J recognised in *Islamic Republic of Iran* at paragraph 21 if service is not dispensed with it would effectively grant the Defendants absolute immunity from suit. In *Islamic Republic of Iran,* the Claimants had already obtained a judgment elsewhere and were seeking to register it for enforcement purposes. Here, the Claimant cannot even start the court process without the cooperation of the Defendants, which has not been forthcoming, if service is not dispensed with.

115.    Conversely, that does make it more important that the court is satisfied that there are exceptional circumstances as a Claim Form is the start of the process.

116.    Here there is no doubt based on the evidence before the court that the Defendants are aware that the Claimant had been seeking to take the steps required by the Defendants

to enable the Claimant to serve the court proceedings on them. The Defendants were aware that they owed a substantial debt to the Claimant.

117. I am satisfied, and find, that on the evidence before me the Eritrean Government were aware that the Claimant was seeking to commence court proceedings in this jurisdiction and that the Claimant had taken all reasonable steps to put the Defendants on notice of those proceedings and to commence them in accordance with the Defendants' own requirements for re-legalisation.

118. It is necessary to balance the interests of the Claimant to commence proceedings to enforce a commercial loan agreement against the interests of the Defendants to be made aware of the commencement of those proceedings by the formal process of service

119. Here the Eritrean Government agreed a process with the FCO which required the Eritrean Embassy to co-operate in the process of re-legalisation to enable proceedings to be served. The Eritrean Embassy in London did not co-operate and did not carry out the re-legalisation process thus leaving the Claimant in a situation where its claim could be thwarted by them. In addition, the Eritrean Government had entered into a commercial loan agreement which specified the United Kingdom as its jurisdiction of choice for any disputes.

120. All the court documents including the Claim Form were delivered to the Embassy in London on more than one occasion. The Claimant's evidence makes it clear that the Eritrean Embassy were told on a number of occasions that the documents were court proceeding, why they needed to be re-legalised and that they were being provided by way of service. The evidence before me is that the Ambassador's personal assistant was seeking guidance from the authorities in Eritrea as long ago as October 2018.

121. In each case the decision as to whether the court should exercise the power to dispense with service will depend on its own facts. As Males LJ said the test to be applied is a broad and flexible test and should not be unduly complex to apply and should not be rigidly circumscribed.

122. Taking all of these factors into account and weighing the competing interests of the Claimant and the Defendant it is fair and just and I am satisfied that there are exceptional circumstances and exercise my discretion to dispense with service of the Claim Form (CPR6.16).  .

123. However, as service of the Claim Form by an alternative method was not valid, and in order to ensure that the Defendants are on notice that an Order dispensing with service of the Claim Form has now been made, it must be notified to them, not by way of service, to the Embassies in London and Doha as well as to the Ministry of Foreign Affairs in Asmara Eritrea. The order will include a period of time for them to apply to set aside or vary the order.

124. This will fairly meet the balance between the interests of the Claimant and the Defendants and address any public policy concerns including those relating to diplomatic relations in accordance with the overriding objective.

## Permission

125.   In the absence of an acknowledgment of service a claimant requires permission to pursue an application for summary judgment pursuant to CPR 24. In *European Union* Bryan J considered the question of permission setting out the guidance to be derived from the authorities at paragraphs 61.

126.   The purpose of the rule and the concern identified in the authorities is to ensure that a Defendant has an opportunity of the time period to file the acknowledgment of service and/or challenge the jurisdiction. The Defendants have had the opportunity to participate for the reasons set out above. In light of the jurisdiction and governing law clauses in the loan agreement any challenge to the jurisdiction would be likely to fail. This concern therefore does not arise on the facts of this case.

127.   A reason for seeking permission to proceed by way of summary judgment is to obtain a judgment on the merits which is more readily enforceable in many jurisdictions than a default judgment. Bryan J confirmed in *European Union* that that was a good reason to permit an application to proceed and I agree.

128.   In order to proceed with an application for summary judgment the court needs to be satisfied as to service and that it has jurisdiction to hear the claim. In most cases that assumes that the claim needs to have been validly served. However, if service of the Claim Form has been dispensed with, as here, there will be no document to be served.

129.   In my view that does not preclude the court from giving permission to proceed with a summary judgment application. It is necessary to balance the interests of the Claimant to pursue its legitimate claim against the interests of the Defendant to be aware of the commencement of the proceedings and to be given an opportunity to acknowledge, challenge jurisdiction and defend those claims. That will require the court to consider the circumstances of the particular case but generally where the court is satisfied that there were exceptional circumstances and it exercises its power to dispense with service of the Claim Form there is no reason why the court should prevent the claimant from seeking to obtain summary judgment rather than default judgment.

130.   For the reasons set out above I have already been satisfied that the Defendants have had every opportunity to engage with these proceedings and that it is appropriate to exercise the court's power to dispense with service. The proceedings are to enforce a commercial loan agreement with a United Kingdom jurisdiction clause. A summary judgment order would be more readily enforceable in some foreign jurisdictions than a default judgment as it is a decision on the merits. In all the circumstances it is appropriate to give permission to proceed with an application for summary judgment.

## Summary Judgment

131.   The Claimant's application for summary judgment can be dealt with relatively shortly.

132.   I have had the benefit of witness evidence from Mr Austin and Mr Hagemeyer in support of the application for summary judgment. As will be clear from this judgment the Defendants have not participated in these proceedings.

133.   As set out above, by a written agreement dated 12 March 2009 (the "Loan Agreement") between the Claimant and the Defendants, the Claimant agreed to lend US$30 million to the first Defendant, guaranteed by the second Defendant. The State of Eritrea, through its ambassador to the State of Qatar, expressly recognised its obligations as guarantor in a letter dated 11 March 2009.  The Ambassador was authorised to sign the Loan Agreement and Guarantee  and the subsequent Addendum referred to below by the President of the State of Eritrea.

134.   By written Addendum dated 17 February 2010 between the same parties, the Claimant agreed to increase the loan to up to US$200 million with the guarantee also being extended accordingly.

135.   The first Defendant subsequently drew down US$199,500,000 under the facility.

136.   The first Defendant made repayments of:

   i)      US$19,792,527 on 4 December 2011 in respect of the principal sums;

   ii)     US$19, 792,527 on 31 May 2012 in respect of the principal sums; and

   iii)    US$5,030,600.57 on 31 May 2012 in respect of interest.

137.   As at the date of this hearing I was provided with an updated schedule setting out the total amount outstanding as US$ 159,914,946 in respect of principal sums and US$ 92,048,342.14 in respect of interest, showing how the sum had been calculated and giving a total amount due and owing at the time of this hearing of US$251,963,288.14.

138.   These sums are repayable on demand pursuant to Clause 4C of the loan agreement. Pursuant to Clause 8 of the addendum agreement that provision endures.

139.   The Claimant's evidence is that it made written demands for repayment on 5 July 2017 and 31 July 2017. Those letters are exhibited to the witness statement in support of the Summary Judgment application. The demands were acknowledged in writing on 23 July 2017 and 23 August 2017 and requested that the Claimant delay recovery action.

140.   On an application for summary judgment the Claimant must establish that the Defendants have no real prospect of success in resisting the claim and there is no other compelling reason for the claim in question to go to trial.

141.   The burden of proof rests with the Claimant but I remind myself that in considering the application for summary judgement the court must consider whether the Defendant has a real prospect as opposed to a fanciful prospect of success. A realistic claim is one which carries some degree of conviction that is it is more than merely arguable. To reach that conclusion I must not conduct a mini trial. However, this does not mean the court must take at face value without analysis everything the Claimant says. I should take into account not only the evidence actually before me but also evidence that can reasonably be expected to be available at trial.

142.   In this case the Defendants have not participated in the proceedings to date. The evidence before the court supports the existence of the loan agreement and guarantee,

the sums having been drawn down, and partial repayments of both capital and interest having been made in 2011 and 2012. In addition, the correspondence in 2017 does not identify any suggested defence to the demand for payment and acknowledges the existence of the debt. I note in particular the Defendant's letter of 23 August 2017 which asks the Claimant to contact the Diwan of the H.H the Emir before they initiate any action and asks that they give the matter more time and patience.

143.   This is a commercial agreement with a jurisdiction and governing law clause that make this the appropriate jurisdiction to determine the dispute.

144.   The monies claimed were loaned to the First Defendant and guaranteed by the Second Defendant and were part repaid both as to capital and interest. When the balance was demanded in 2017 the debt was not denied and the evidence before the court does not identify any defence or objection ever having been raised. The Defendants have not participated in this claim to date and have not advanced any defence to the claim in these proceedings. There is no evidence before me of any defence at all let alone one that would have a real prospect of success and no reason for this claim to proceed to trial.

145.   I am satisfied that there is no real prospect of the Defendant successfully defending this claim and the Claimant is entitled to Summary Judgment.

146.   For the reasons set out above I find :

   i)      The Court does have Power to Dispense with Service of the Claim Form in a case against a foreign state.

   ii)     There are there exceptional circumstances that justify exercising that power in this case.

   iii)    The court gives permission to pursue the summary judgment application pursuant to CPR 24 in the absence of an acknowledgment of service.

   iv)    The Claimant is entitled to summary judgment on their claim but that summary judgment cannot be enforced until after the order to dispense with service of the Claim Form has been notified to the Eritrean Government and the Defendants have had a period of time to respond or apply to set aside or vary the order made following this judgment.

147.   I invite counsel for the Claimant to prepare a draft order for consideration reflecting the terms of this judgment.