## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

QATAR NATIONAL BANK (QPSC),

                Plaintiff,

    v.

GOVERNMENT OF ERITREA,
STATE OF ERITREA,

                Defendants.

No. 1:21-cv-00436-ACR-MAU

## PLAINTIFF QATAR NATIONAL BANK (QPSC)'S OBJECTIONS TO MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDATIONS

Robert K. Kry
D.C. Bar #490545
Kenneth E. Notter III
D.C. Bar #1708367
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2011
Fax: (202) 556-2001
rkry@mololamken.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

BACKGROUND ........................................................................................................... 1

I.     Factual Background ........................................................................................... 1

II.    The Magistrate Judge's Report and Recommendation ....................................... 3

ARGUMENT ............................................................................................................... 3

I.     Ambassador Ahmad Had Actual Authority To Waive Immunity ...................... 4

       A.     QNB Submitted Ample Evidence of Ambassador Ahmad's Authority ................. 5

       B.     The Magistrate Judge's Reasoning Does Not Support Denial of the Motion ....... 11

       C.     The Court Should Consider QNB's Additional Evidence of Authority .............. 14

II.    The Eritrean Government Ratified the Ambassador's Agreement ................... 15

III.   Ambassador Ahmad Had Apparent Authority .................................................. 17

IV.    If the Court Overrules QNB's Objections, It Should Permit QNB To File
       a Renewed Motion ........................................................................................... 18

CONCLUSION ........................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*,
    663 F. Supp. 3d 11 (D.D.C. 2023) ...................................................................................4

\* *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*,
    179 F.3d 1279 (11th Cir. 1999) ...................................................................................6, 7

*Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*,
    793 F. Supp. 2d 124 (D.D.C. 2011) ...............................................................................4

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006) .........................................................................................................7

*CapitalKeys, LLC v. Democratic Republic of Congo*,
    No. 21-7070, 2022 WL 2902083 (D.C. Cir. July 22, 2022) ...............................13, 17

*Citizens for Resp. & Ethics in Wash. v. FEC*,
    66 F. Supp. 3d 134 (D.D.C. 2014) ...............................................................................14

*CommSolvers LLC v. Wieland N. Am., Inc.*,
    No. 3:21-cv-01234, 2025 WL 786330 (S.D. Ill. Mar. 12, 2025) ...............................10

*DeLassus v. United States*,
    34 U.S. (9 Peters) 117 (1835) .........................................................................................9

*Dentons US LLP v. Republic of Guinea*,
    410 F. Supp. 3d 194 (D.D.C. 2019) .............................................................................16

*First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda – Permanent Mission*,
    877 F.2d 189 (2d Cir. 1989) .........................................................................................17

\* *GDG Acquisitions LLC v. Gov't of Belize*,
    849 F.3d 1299 (11th Cir. 2017) .........................................................................8, 16, 17

*Goodwin v. Syrian Arab Republic*,
    No. 23-cv-267, 2025 WL 1040847 (D.D.C. Apr. 8, 2025) ...................................14, 15

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ...........................................................................................7

*Isaac Indus., Inc. v. Petroquimica de Venezuela, S.A.*,
    127 F.4th 289 (11th Cir. 2025) .....................................................................................16

*Jota v. Texaco, Inc.*,
    157 F.3d 153 (2d Cir. 1998) ...........................................................................................7

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*,
  841 F. Supp. 2d 769 (S.D.N.Y. 2012)......................................................................6

*Levinson v. Islamic Republic of Iran*,
  443 F. Supp. 3d 158 (D.D.C. 2020)........................................................................6

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).................................................................................................4

*Marra v. Papandreou*,
  216 F.3d 1119 (D.C. Cir. 2000)..............................................................................7

*Oster v. Republic of South Africa*,
  530 F. Supp. 2d 92 (D.D.C. 2007),..................................................................12, 13

\* *SACE S.p.A. v. Republic of Paraguay*,
  243 F. Supp. 3d 21 (D.D.C. 2017)......................................................7, 12, 17, 18

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
  362 F. Supp. 2d 168 (D.D.C. 2005).......................................................................6

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*,
  263 F.3d 26 (2d Cir. 2001)......................................................................................9

*Stevenson v. Tyco Int'l (US) Inc. Suppl. Exec. Ret. Plan*,
  No. 04-cv-4037, 2006 WL 2827635 (S.D.N.Y. Sept. 29, 2006) .............................9

*Taylor v. District of Columbia*,
  325 F. Supp. 3d 144 (D.D.C. 2018)..................................................................14, 15

*Thomas v. INS*,
  35 F.3d 1332 (9th Cir. 1994) ..................................................................................9

*TIG Ins. Co. v. Republic of Argentina*,
  110 F.4th 221 (D.C. Cir. 2024)..............................................................................15

*TJGEM LLC v. Republic of Ghana*,
  26 F. Supp. 3d 1 (D.D.C. 2013)............................................................................13

### TREATY PROVISIONS, STATUTES, AND RULES

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
  June 10, 1958, 21 U.S.T. 2517..............................................................................10

Vienna Convention on the Law of Treaties,
  May 23, 1969, 1155 U.N.T.S. 331 ..........................................................................8

28 U.S.C. § 1330(a)........................................................................................................4

Fed. R. Evid. 201(b) ........................................................................................................5

Fed. R. Evid. 201(d) ........................................................................................................5

Fed. R. Evid. 801(d)(2) ....................................................................................................6

Local Civ. R. 72.3(b) ........................................................................................................1

Local Civ. R. 72.3(c) ..................................................................................................3, 14

## OTHER AUTHORITIES

All Africa, *Eritrea Ambassador Ali Ibrahim Holds Talks with Qatari Official*
(Nov. 24, 2005) ..........................................................................................................5

Benjamin Augé, *Diplomatic Relations Between Qatar and Sub-Saharan Africa:*
*An Evolving Affair* (2016) ........................................................................................6

Eritrea Ministry of Information, *Ambassador Ali Ibrahim Holds Talks with Qatari*
*Minister* (Aug. 11, 2010) ..........................................................................................5

Eritrea Ministry of Information, *Ambassador Holds Talks with Chairman of*
*Qatari Media Organization* (May 19, 2010) ............................................................5

Eritrea Ministry of Information, *Eritrean Ambassador to Qatar Holds Talks with*
*Qatari Senior Official* (Apr. 13, 2016) ....................................................................5

*Restatement (Fourth) of Foreign Relations Law of the United States* (2018) ...................8, 17

*Restatement (Third) of Agency* (2006) .........................................................................15

United Nations Treaty Section of the Office of Legal Affairs,
*Treaty Handbook* (rev. ed. 2013) ..............................................................................8

Pursuant to this Court's Local Civil Rule 72.3(b), Plaintiff Qatar National Bank (QPSC) ("QNB") respectfully submits these objections to the Honorable Moxila A. Upadhyaya's May 14, 2025 Report and Recommendation (Dkt. 25) proposing that the Court deny QNB's motion for default judgment without prejudice.

## **BACKGROUND**

### I.    FACTUAL BACKGROUND

QNB filed this action on February 19, 2021, seeking to recognize and enforce an English judgment it obtained against the Government and State of Eritrea after they defaulted on a Loan Agreement and Guarantee.  Dkt. 1.

The Government of Eritrea executed that Loan Agreement on March 12, 2009.  O'Sullivan Decl. Ex. A (Dkt. 17-2).  The cover page of the Loan Agreement identifies the Government's representative in the transaction as follows:

> Represented by:
> Mr. Ali Ibrahim Ahmad
> Ambassador of the State of Eritrea to Qatar
> According to the authorization signed by the Eritrean President
> on March 10th, 2009AD

*Id.*  The signature page identifies the Government's signatory the same way:

> Represented by:
> Mr. Ali Ibrahim Ahmad
> Ambassador of the State of Eretria [sic – typo in translation] to the State of Qatar
> According to the authorization signed by the President of the State of Eritrea
> on March 10th, 2009

*Id.* at 6.  Next to the ambassador's signature, there is a handwritten witness verification:  "Signature of His Excellency Ambassador Ali Ibrahim Ahmad, conform SV [signature]."  *Id.*

The Loan Agreement contains a consent-to-jurisdiction clause in Section 11:  "[T]he courts of the United Kingdom or any other courts chosen by the Bank shall have jurisdiction to consider any dispute which may arise out of or in connection with this Agreement and Borrower waives his

right to object to the jurisdiction of such courts." O'Sullivan Decl. Ex. A § 11 (Dkt. 17-2). QNB's position is that, by its express terms, that consent to jurisdiction in "any other courts chosen by the Bank" constitutes a clear waiver of Eritrea's jurisdictional immunity.

Following Eritrea's execution of the Loan Agreement in March 2009, QNB disbursed US$199.5 million of funds. O'Sullivan Decl. ¶9 (Dkt. 17-1). The Government performed under the Loan Agreement for over three years, repaying US$19.8 million in principal in December 2011 and another US$24.8 million in principal and interest in May 2012. *Id.* After May 2012, however, the Government ceased making payments. *Id.*

QNB sued the Government and State of Eritrea in the United Kingdom's High Court of Justice. The English court entered judgment in QNB's favor. O'Sullivan Decl. Ex. D (Dkt. 17-5). Although Eritrea failed to appear, the court entered a fully reasoned merits judgment rather than a default judgment, in order to make the judgment more readily enforceable elsewhere. *Id.* ¶130. In the course of its analysis, the court found that "[t]he Ambassador was authorised to sign the Loan Agreement and Guarantee . . . by the President of the State of Eritrea." *Id.* ¶133.

QNB then filed this action in this Court on February 19, 2021, seeking to recognize and enforce the English judgment. Dkt. 1. After defendants failed to appear, QNB filed a motion for default judgment, which was fully briefed on August 6, 2021. Dkt. 17. On February 24, 2023, the case was reassigned to Your Honor. On May 9, 2023, the Court referred QNB's motion to the Honorable Moxila A. Upadhyaya for a report and recommendation.

To the best of QNB's knowledge, throughout that entire sixteen-year history – including three years of partial performance, proceedings in the UK courts of which Eritrea had due notice, and then further proceedings in this Court – Eritrea never once contended that the Loan Agreement was invalid because its ambassador lacked authority to execute it.

2

## II.    THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On May 14, 2025, the Magistrate Judge issued a report and recommendation ("R&R") proposing that QNB's motion be denied without prejudice.  Dkt. 25.  The R&R stated that it "need not reach the question" whether Section 11 of the Loan Agreement was a waiver of immunity because QNB "fail[ed] to show that Ahmad had authority to waive sovereign immunity on behalf of Eritrea." *Id.* at 4.  The R&R stated that it was unclear "whether an ambassador has the authority as a matter of law to enter into commercial contracts with third parties and waive sovereign immunity." *Id.* at 6.  And it opined that "[t]he Bank has failed to present any evidence on Ahmad's position," has "offer[ed] no explanation about the meaning of Ahmad's 'authorization' from the Eritrean President," and has not "made clear that the ***President*** had authority to waive Eritrea's immunity" either. *Id.*

The R&R concluded that "default judgment against Eritrea is inappropriate." Dkt. 25 at 7. However, it "recommend[ed] that the Bank have the opportunity to refile its Motion should it wish to introduce additional evidence in an attempt to meet its burden." *Id.*

## ARGUMENT

Where a district court refers a dispositive motion to a magistrate judge for a report and recommendation, the Court "shall make a de novo determination of those portions of a magistrate judge's findings and recommendations to which objection is made."  Local Civ. R. 72.3(c).  The Court "may make a determination based solely on the record developed before the magistrate judge," or it "may conduct a new hearing, receive further evidence, and recall witnesses." *Id.*  The Court "may accept, reject, or modify, in whole or in part, the findings and recommendations of the magistrate judge, or may recommit the matter to the magistrate judge with instructions." *Id.*  For the reasons below, the Court should reject the Magistrate Judge's report and recommendation and enter judgment in QNB's favor.

The R&R recommended denial of QNB's motion on a theory that Eritrea has never once raised in over sixteen years since the execution of the Loan Agreement – that Eritrea's ambassador lacked authority to enter into the Loan Agreement and its immunity waiver.  But the ***Loan Agreement itself*** is strong evidence of the ambassador's authority:  It states on its face that Mr. Ahmad executed the agreement as "Ambassador of the State of Eritrea to Qatar . . . [a]ccording to the authorization signed by the Eritrean President on March 10th, 2009AD."  O'Sullivan Decl. Ex. A (Dkt. 17-2).  That evidence is corroborated by the customary powers of foreign ambassadors and heads of state, Eritrea's own subsequent conduct partially performing the agreement, and the English court's finding that the ambassador had authority to execute the agreement.

Absent any suggestion by Eritrea that its ambassador ***lacked*** authority to sign the Loan Agreement, QNB had no burden to present more evidence than it did.  The cases the R&R cited are inapposite.  They were all ***contested*** cases where the sovereign showed up and offered substantial evidence that the signatory lacked authority.  None of those cases suggests that QNB had to do more than it did just to make a prima facie showing of authority.

## I.    AMBASSADOR AHMAD HAD ACTUAL AUTHORITY TO WAIVE IMMUNITY

Because an exception to immunity is necessary to support the Court's subject matter jurisdiction, a plaintiff asserting claims against a sovereign must furnish evidence that an exception applies.  28 U.S.C. § 1330(a).  But that principle does not require conclusive or irrefutable proof.  Rather, subject matter jurisdiction "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Thus, "[t]he plaintiff bears the burden of establishing, ***by a preponderance of the evidence***, that the court has jurisdiction."  *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 663 F. Supp. 3d 11, 18 (D.D.C. 2023) (emphasis added); *see also Bazarian Int'l Fin. Assocs., LLC v.*

*Desarrollos Aerohotelco, C.A.*, 793 F. Supp. 2d 124, 127 (D.D.C. 2011) (same).  The evidence that QNB submitted far exceeds that standard.

### A.    QNB Submitted Ample Evidence of Ambassador Ahmad's Authority

The R&R's finding that QNB "failed to provide any evidence to support Ahmad's authority to bind Eritrea" is not supported by the record.  Dkt. 25 at 5.  For one thing, the ***Loan Agreement itself*** is substantial evidence of that authority.

The Loan Agreement expressly identifies Mr. Ahmad as the "Ambassador of the State of Eritrea to Qatar."  O'Sullivan Decl. Ex. A at cover, 6 (Dkt. 17-2).  The signature page includes a witness verification confirming the signature's authenticity and the signatory's ambassadorial status.  *Id.* at 6 ("Signature of His Excellency Ambassador Ali Ibrahim Ahmad, conform SV [signature].").  Eritrea's state-owned media agency has repeatedly identified Mr. Ahmad as Eritrea's longtime Ambassador to Qatar in publications of which this Court may take judicial notice.  *See, e.g.*, Eritrea Ministry of Information, *Ambassador Holds Talks with Chairman of Qatari Media Organization* (May 19, 2010), shabait.com/2010/05/19/ambassador-holds-talks-with-chairman-of-qatari-media-organization ("The Eritrean Ambassador to Qatar, Mr. Ali Ibrahim Ahmed, held talks with the Chairman of the Qatari Media Organization, Sheik Hamed Bin Tamir Al-Thani, on fostering bilateral cooperation."); Fed. R. Evid. 201(b), (d) (court may "take judicial notice at any stage of the proceeding" where a fact is not subject to reasonable dispute).[1]

---

[1] For other examples, see Eritrea Ministry of Information, *Eritrean Ambassador to Qatar Holds Talks with Qatari Senior Official* (Apr. 13, 2016), shabait.com/2016/04/13/eritrean-ambassador-to-qatar-holds-talks-with-qatari-senior-official ("The Eritrean Ambassador to Qatar Mr. Ali Ibrahim Ahmed held talks with the Qatari Chairman of Cabinet Ministers and Minister of Interior Sheik Abdullah bin Nasser bin Khalifa Al-Thani on bilateral issues on 12 April in Doha."); Eritrea Ministry of Information, *Ambassador Ali Ibrahim Holds Talks with Qatari Minister* (Aug. 11, 2010), shabait.com/2010/08/11/ambassador-ali-ibrahim-holds-talks-with-qatari-minister ("The Eritrean Ambassador to Qatar, Mr. Ali Ibrahim Ahmed, held talks with the Qatari Minister of Culture, Arts and Tradition, Dr. Hamed Bin Abdul-Aziz Al-Kewari."); All Africa, *Eritrea Ambassador Ali Ibrahim Holds Talks with Qatari Official* (Nov. 24, 2005), allafrica.com/stories/

The Loan Agreement also evidences Mr. Ahmad's authority to enter into the agreement. By signing the document, Mr. Ahmad represented that he was doing so "[a]ccording to the authorization signed by the Eritrean President on March 10th, 2009AD." O'Sullivan Decl. Ex. A at cover, 6 (Dkt. 17-2). Under the Federal Rules of Evidence, an agent's own representation of authority is evidence that "must be considered" in assessing his authority to bind the principal, although corroborating evidence is required. Fed. R. Evid. 801(d)(2). That principle has particular force for an ambassador: The Court should not lightly assume that high-ranking diplomats would misrepresent their authority to take an official act. Ambassador Ahmad's representation in the Loan Agreement that he was "authoriz[ed]" to enter into the agreement containing the immunity waiver is thus important evidence that he was in fact authorized to do so.

Other evidence corroborates that authority. Mr. Ahmad's status as Eritrea's Ambassador to Qatar is evidence of his authority because ambassadors customarily have authority to waive immunity. Courts have repeatedly recognized that customary authority based on the inherently diplomatic nature of an immunity waiver. *See, e.g.*, *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1294-300 (11th Cir. 1999) ("[W]hen, as here, a duly accredited head of a diplomatic mission (such as an ambassador) files a waiver of his or her sovereign's immunity in a judicial proceeding, the court should assume that the sovereign has authorized the waiver absent

---

200511280911.html ("Eritrean Ambassador to Qatar, Mr. Ali Ibrahim Ahmed today met and held talks with Head of the Arabian Affairs Desk in the Qatari Foreign Ministry, Mr. Abdelaziz Al-Sahlawi . . . ."); *see also* Benjamin Augé, *Diplomatic Relations Between Qatar and Sub-Saharan Africa: An Evolving Affair* 7 (2016) ("[Eritrea's] ambassador, Ali Ibrahem Ahmad, is the most senior member of the foreign diplomatic corps in Qatar and he has been in office since the opening of the chancery."). Courts routinely take judicial notice of similar materials. *See, e.g.*, *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 170 (D.D.C. 2020) (government press releases and websites); *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 180 (D.D.C. 2005) (foreign official statements); *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 788-89 n.11 (S.D.N.Y. 2012) (foreign agency website).

extraordinary circumstances." (footnotes omitted)); *see also Hourani v. Mirtchev*, 796 F.3d 1, 13 (D.C. Cir. 2015) ("[W]hen an ambassador speaks in his or her official capacity, that statement 'must be regarded . . . as an authoritative representation by the [foreign] government' itself . . . ."); *Jota v. Texaco, Inc.*, 157 F.3d 153, 162 (2d Cir. 1998) ("An ambassador generally has the power to 'bind the state that he represents' . . . ."); *SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21, 37 (D.D.C. 2017) ("[I]n light of the internationally recognized powers of ambassadors, United States courts may reasonably rely on a foreign country's duly executed appointment of an individual to that position as a manifestation of his or her presumptive authority to waive the sovereign's immunity in judicial proceedings." (citing *Aquamar*, 179 F.3d at 1294)).

The R&R questioned whether an ambassador "has the authority as a matter of law to enter into commercial contracts with third parties."  Dkt. 25 at 6; *cf. SACE*, 243 F. Supp. 3d at 37-38 (questioning whether authority extends beyond waivers in judicial proceedings).  But that concern overlooks the principle that dispute resolution clauses like Section 11 are severable from the contracts in which they appear.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."); *Marra v. Papandreou*, 216 F.3d 1119, 1125 (D.C. Cir. 2000) (same for forum selection clauses).  Thus, the question is not whether Ambassador Ahmad had inherent authority to enter into the Loan Agreement, only whether he had authority to agree to the immunity waiver.  He did:  An immunity waiver is a government's representation to a foreign party of its willingness to subject itself to foreign judicial process and thus falls squarely within an ambassador's diplomatic wheelhouse.  That is true whether the waiver appears in a court pleading, an international commercial contract, or some other context.

Ambassador Ahmad, moreover, was cloaked not only with his own authority, but with the authority of the Eritrean President too.  O'Sullivan Decl. Ex. A at cover, 6 (Dkt. 17-2) (invoking "the authorization signed by the Eritrean President on March 10th, 2009AD").  As a matter of settled international law, a foreign state's president has presumptive authority to act for the state, without any further proof of specific powers.  *See Restatement (Fourth) of Foreign Relations Law of the United States* § 302 cmt. b (2018) ("Heads of state . . . are understood to have the authority to represent the state without having to produce full powers."); United Nations Treaty Section of the Office of Legal Affairs, *Treaty Handbook* 6 § 3.2.1 (rev. ed. 2013) ("The Head of State . . . may sign a treaty on behalf of the State without an instrument of full powers."); Vienna Convention on the Law of Treaties art. 7(2)(a), May 23, 1969, 1155 U.N.T.S. 331, 334 ("In virtue of their functions and without having to produce full powers, the following are considered as representing their State: (a) Heads of State . . . .").  If a foreign nation's head of state and chief executive cannot waive the state's immunity, who can?

Still more evidence corroborates the ambassador's authority.  Following execution, the Government partially performed the Loan Agreement for over three years, repaying US$19.8 million in principal in December 2011 and another US$24.8 million in principal and interest in May 2012.  O'Sullivan Decl. ¶ 9 (Dkt. 17-1).  That partial performance is powerful evidence of the ambassador's authority:  The Government presumably would not pay back principal and interest on a Loan Agreement that the signatory had no right to sign.  As explained below, courts often rely on partial performance to find ratification of an agent's act.  *See, e.g.*, *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1307-10 (11th Cir. 2017).  Partial performance is also relevant because it tends to show that the agent in fact had authority to act in the first place.

Finally, the English judgment provides more corroborating evidence. The English court expressly found, in an extensive reasoned decision, that "[t]he Ambassador was authorised to sign the Loan Agreement and Guarantee . . . by the President of the State of Eritrea." O'Sullivan Decl. Ex. D ¶ 133 (Dkt. 17-5). Although Eritrea did not participate in those proceedings and thus may not be bound by collateral estoppel, the English court's finding is entitled to some weight.

Precedent confirms the adequacy of that prima facie showing. Nearly two centuries ago, the Supreme Court held that "[h]e who alleges that an officer entrusted with an important duty has violated his instructions, must show it." *DeLassus v. United States*, 34 U.S. (9 Peters) 117, 134 (1835). The reason is that, when a government officer executes an instrument, his act "carries with it prima facie evidence that it is within his power." *Id.* Applying that principle, the Ninth Circuit held that a U.S. Attorney's agreement to withhold removal was enforceable against the government even without extrinsic evidence that he obtained the necessary approvals: The official's mere execution of the agreement was prima facie evidence of those approvals. *See Thomas v. INS*, 35 F.3d 1332, 1341 (9th Cir. 1994) ("[T]he government's plea bargain with Thomas sufficed as prima facie evidence of authority, and the burden of proof was on the government to show that the United States Attorney violated his [approval requirements].").

Courts apply the same rule to private contract disputes, holding that a plaintiff's prima facie showing of authority puts the burden on the other party to disprove it. *See, e.g.*, *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 33 (2d Cir. 2001) (enforcing contract where defendant offered no "evidence" other than "speculation" that agent exceeded authority); *Stevenson v. Tyco Int'l (US) Inc. Suppl. Exec. Ret. Plan*, No. 04-cv-4037, 2006 WL 2827635, at *7 (S.D.N.Y. Sept. 29, 2006) ("If Defendants had presented evidence to support their allegation that Mr. Kozlowski was acting outside his authority . . . , the Retention Agreement might be void . . . .

9

However, Defendants presented no such evidence."); *CommSolvers LLC v. Wieland N. Am., Inc.*, No. 3:21-cv-01234, 2025 WL 786330, at *7 (S.D. Ill. Mar. 12, 2025) ("Whether a jury ultimately believes that Schuetz 'got the CommSolvers contract approved' is irrelevant.  What matters is that Schuetz's representation to that effect is competent evidence of his actual authority . . . .").  Contracts often include representations and warranties attesting to their signatories' authority – precisely because those representations have evidentiary weight.

Finally, the New York Convention takes the same approach.  Under the Convention, a party seeking to enforce an arbitral award need only submit "[t]he duly authenticated original award or a duly certified copy" and "[t]he original [arbitration] agreement . . . or a duly certified copy." Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. IV.1, June 10, 1958, 21 U.S.T. 2517, 2519-20.  There is no requirement to submit extrinsic evidence of the signatory's authority.  The respondent can challenge the agreement's validity for lack of authority, but the ***respondent*** bears the burden of proof on that issue.  *Id.* art. V.1(a), 21 U.S.T. at 2520.

To be sure, prima facie evidence is not conclusive proof.  It is theoretically possible that the person who signed the Loan Agreement was an impostor posing as Ambassador Ahmad, or that Ambassador Ahmad forged his presidential authorization.  But those scenarios, while possible, are not very likely, so they do not overcome QNB's prima facie showing by a preponderance of the evidence.  If Eritrea had some genuine basis for challenging Ambassador Ahmad's authority, it would have shown up at some point to assert it.  The Court should not delay QNB's legitimate enforcement efforts based on an alleged failure to anticipate and respond to a defense that Eritrea has never asserted and could not in good faith assert.

**B.    The Magistrate Judge's Reasoning Does Not Support Denial of the Motion**

The Magistrate Judge's report and recommendation does not warrant a contrary conclusion.  The R&R's findings that QNB presented "no evidence" on various issues are contrary to the record.  And the cases the R&R relies on all involved contested proceedings where a sovereign showed up and presented substantial evidence to dispute a signatory's authority.

The R&R's finding that "the Bank has failed to provide any evidence to support Ahmad's authority to bind Eritrea" (Dkt. 25 at 5) is incorrect for all the reasons stated above.  *See* pp. 5-9, *supra*.  The claim that "[t]he Bank has failed to present any evidence on Ahmad's position" (Dkt. 25 at 6) overlooks that the Loan Agreement itself identifies Mr. Ahmad as Eritrea's Ambassador to Qatar, a witness authenticated his signature and ambassadorial position, and the Government has acknowledged his position multiple times.  *See* pp. 5-6 & n.1, *supra*.  The claims that "it is unclear whether an ambassador has actual authority to waive immunity" and that "the Bank [has not] made clear that the ***President*** had authority to waive Eritrea's immunity" (Dkt. 25 at 6) are contrary to the legal authorities cited above that establish as a matter of law that foreign ambassadors have presumptive authority to waive immunity and that foreign heads of state have presumptive authority to act for their country generally.  *See* pp. 6-8, *supra*.  No additional evidence is necessary to establish facts that are presumed from a foreign official's position.

The R&R's finding that "[t]he Bank offers no explanation about the meaning of Ahmad's 'authorization' from the Eritrean President" (Dkt. 25 at 6) does not support denial of the motion either.  No further explanation is necessary because the description in the Loan Agreement adequately describes the authorization:  Ambassador Ahmad executed the Loan Agreement "[a]ccording to the authorization signed by the Eritrean President on March 10th, 2009AD." O'Sullivan Decl. Ex. A at cover, 6 (Dkt. 17-2).  The Loan Agreement thus makes clear who signed the authorization (the President), when he signed it (two days earlier), and what it authorized the

ambassador to do (sign the Loan Agreement).  The Foreign Sovereign Immunities Act does not require a foreign official's delegation of authority to take any particular form, so no further explanation of the authorization is necessary to support QNB's prima facie case.

The R&R's legal authorities are similarly unsupportive.  All the cases it cited were contested cases where the foreign sovereign actually showed up to dispute its purported agent's authority – often with compelling evidence in hand.

For example, in *SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21 (D.D.C. 2017) (Ketanji Brown Jackson, J.), the Paraguayan president's nephew-in-law issued purported government guarantees in favor of two private companies he owned.  *Id.* at 27.  He "purported to execute the Guarantees by affixing the seal of a Paraguayan embassy that did not exist" and had been criminally convicted and sentenced to "a prison term of seven years for use of forged documents."  *Id.* at 28, 42.  It was ***undisputed*** that the nephew-in-law lacked actual authority; the only dispute was over apparent authority.  *Id.* at 24.  The court held that apparent authority was not sufficient, and that it was lacking in any event because "any belief that the Paraguayan official at issue here had the authority to waive Paraguay's sovereign immunity was unreasonable, given the fact the official ***was not a duly-accredited ambassador*** . . . and was also patently engaged in self-dealing when he made the waiver representation."  *Id.* at 24 (emphasis added).

Similarly, in *Oster v. Republic of South Africa*, 530 F. Supp. 2d 92 (D.D.C. 2007), *aff'd*, 298 F. App'x 6 (D.C. Cir. 2008), the purported government representatives were managing officers of two private investigative firms.  *Id.* at 94-95.  The plaintiffs argued that the investigators had authority to bind the South African government because the companies were supposedly "front companies for South Africa."  *Id.* at 95.  But the court found no evidence whatsoever to support

that theory and instead accepted South Africa's showing that the government "exerted no control" over the companies at all.  *Id.* at 98-99.

In *CapitalKeys, LLC v. Democratic Republic of Congo*, No. 21-7070, 2022 WL 2902083 (D.C. Cir. July 22, 2022), the outgoing Governor of the Central Bank of the Democratic Republic of Congo signed a lucrative public affairs contract with a U.S. company.  When the company later tried to enforce the agreement, the Central Bank responded that the Governor lacked authority to sign it, demonstrating that only the Central Bank's Board had that authority under Congolese law. *Id.* at *2.  The court analyzed the relevant statutes and agreed with that interpretation.  *Id.*

Finally, in *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*, No. 14-7036, 2015 WL 3653187 (D.C. Cir. June 9, 2015), the plaintiff sued the government of Ghana for awarding a contract to a competitor allegedly in return for a bribe.  *Id.* at 9.  Ghana defended against that claim by showing that the allegedly bribed official had no authority to award the contract under Ghanaian law.  *Id.*  The court agreed.  *Id.* at 10.

None of those cases bears any resemblance to this one.  The fact that foreign governments sometimes successfully contest claims of authority based on actual evidence or actual legal citations showing lack of authority does not mean that a plaintiff must anticipate and refute such arguments even when the Government has never suggested any doubts about its signatory's authority.  The record establishes Ambassador Ahmad's prima facie authority to enter into the Loan Agreement and its immunity waiver, and Eritrea has never offered any evidence or argument to the contrary.  The R&R erred by recommending denial of QNB's motion on the basis of a theory that has no evidentiary support and that Eritrea has never even attempted to assert.

**C.**     **The Court Should Consider QNB's Additional Evidence of Authority**

While the evidence before the Magistrate Judge was sufficient to carry QNB's prima facie

burden of proof, the Court may receive additional evidence on review of the R&R.  Specifically,

although the Local Rules permit the Court to "make a determination based solely on the record

developed before the magistrate judge," the Court alternatively may "receive further evidence."

Local Civ. R. 72.3(c).  Courts regularly exercise that authority.  *See, e.g.*, *Goodwin v. Syrian*

*Arab Republic*, No. 23-cv-267, 2025 WL 1040847, at *9 (D.D.C. Apr. 8, 2025) ("Relying on

new evidence not before Magistrate Judge Harvey, the Court will REJECT the Report's

conclusion . . . ."); *Taylor v. District of Columbia*, 325 F. Supp. 3d 144, 145 (D.D.C. 2018)

(exercising "discretion to consider supplemental evidence when reviewing the magistrate judge's

Report and Recommendation"); *Citizens for Resp. & Ethics in Wash. v. FEC*, 66 F. Supp. 3d 134,

145 (D.D.C. 2014) (considering additional exhibits).  The Court should take that approach here.

First, QNB is submitting a copy of the presidential authorization referenced in the Loan

Agreement.  Declaration of Samer Haddad ("Haddad Decl.") Ex. A (attached hereto).  That

document, signed by Isaias Afwerki, President of the State of Eritrea, on March 10, 2009, states:

"Mr. Ali Ibrahim Ahmed, Ambassador of the State of Eritrea to the State of Qatar, is hereby

authorized to sign, on behalf of and representing the Government of Eritrea, the loan agreement

between the Government of Eritrea and Qatar National Bank."  *Id.* at 1.  The attached exhibit also

includes the separate authorization the Eritrean President signed on December 24, 2009, when the

parties increased the amount of the loan.  *Id.* at 2.  Those documents confirm that the Loan

Agreement accurately describes the presidential authorization.

Second, QNB is submitting copies of its correspondence with Eritrea from July and August

2017 that is referenced in Paragraph 20 of the Complaint.  Haddad Decl. Ex. B (attached hereto).

That correspondence shows that, after QNB demanded repayment of the loan, Eritrea responded,

not by disputing the validity of the Loan Agreement, but by stalling for time. *See id.* at 4 ("We also kindly ask for your patience and understanding."). Those letters confirm that Eritrea never had any doubts about its ambassador's authority to sign the agreement.

The Court should exercise its discretion to consider that additional evidence at this stage. Courts in this District consider additional evidence on review of a magistrate judge's decision when "doing so . . . would not prejudice the [opposing party]." *Taylor*, 325 F. Supp. 3d at 145. There is no risk of prejudice here. The documents at issue are routine business records whose authenticity cannot reasonably be questioned. Eritrea is not participating in this litigation and thus is not being deprived of any opportunity to respond. Finally, the R&R recommends that QNB's motion be denied without prejudice to submitting additional evidence. Dkt. 25 at 7. QNB's additional evidence will thus be in front of the Court sooner or later regardless. Particularly given that QNB's motion has already been pending for nearly four years, the Court should not inject unnecessary procedural steps into the resolution of the motion.

## II. THE ERITREAN GOVERNMENT RATIFIED THE AMBASSADOR'S AGREEMENT

Even if Ambassador Ahmad lacked authority to enter into the Loan Agreement and its immunity waiver, the R&R still erred in recommending denial of QNB's motion. The evidence shows that Eritrea later ratified the agreement.

The Foreign Sovereign Immunities Act does not "displace common-law contract principles that inform . . . what constitutes the 'making' of an 'agreement.'" *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 234 (D.C. Cir. 2024). One of those principles is ratification. A principal ratifies an agent's unauthorized act when the principal engages in "conduct that justifies a reasonable assumption that the person so consents" to the act. *Restatement (Third) of Agency* § 4.01(2)(b) (2006). "[W]hen a person ratifies another's act, the legal consequence is that the

person's legal relations are affected as they would have been had the actor been an agent acting with actual authority at the time of the act." *Id.* cmt. b.

Applying those principles, courts have repeatedly found that a foreign sovereign ratified an agent's execution of an agreement by partially performing the agreement. In *GDG Acquisitions LLC v. Government of Belize*, 849 F.3d 1299 (11th Cir. 2017), for example, the Belize government sought to avoid an immunity waiver in a lease agreement on the ground that the Minister of Budget Management who signed the lease lacked authority to waive immunity. The court rejected that argument. Even if the Minister lacked authority, it explained, the government ratified the contract by "ma[king] forty payments of $337,409.46 each in accordance with the lease schedules," thereby ratifying "the explicit waiver of sovereign immunity contained within the Master Lease Agreement." *Id.* at 1307-10; *see also Dentons US LLP v. Republic of Guinea*, 410 F. Supp. 3d 194, 211-15 (D.D.C. 2019) ("[E]ven if Minister Yansane was required to approve the retainer agreements, . . . the government of Guinea . . . ultimately ratified the agreements," including by "making a payment"); *Isaac Indus., Inc. v. Petroquimica de Venezuela, S.A.*, 127 F.4th 289, 301 (11th Cir. 2025) ("Even if we assume that Silva lacked actual or apparent authority, Pequiven ratified the agreement months later when it met the first payment deadline and tendered a payment of $2,947,542.00 to Isaac.").

Those ratification principles apply here. After the execution of the Loan Agreement in March 2009, Eritrea repaid US$19.8 million in principal in December 2011 and then another US$24.8 million in principal and interest in May 2012. O'Sullivan Decl. ¶9 (Dkt. 17-1). The Government thus partially performed under the Loan Agreement for over three years. Those partial payments constitute a ratification of the Loan Agreement and its immunity waiver.

A foreign sovereign may also ratify an immunity waiver through the "retention of benefits generated by the agent's act." *GDG Acquisitions*, 849 F.3d at 1309. "[A] principal's retention of benefits realized as a result of his agent's unauthorized actions likewise suggests that although the agent might initially have acted without authority, the principal has approved the act and wishes to be bound by it." *Id.* at 1309-10 (finding ratification of immunity waiver where "the Government retained the telecommunications equipment for the duration of the two leases and, indeed, . . . the Government still has not returned the equipment").

In this case, the Government ceased making any payments on the Loan Agreement after May 2012. O'Sullivan Decl. ¶9 (Dkt. 17-1). That conduct constitutes a "retention of benefits" that independently justifies a finding of ratification. If Eritrea genuinely thought that Ambassador Ahmad lacked authority to enter into the Loan Agreement, it should have given the money back. Eritrea's decision to keep the money implies ratification of the loan.

## III.    AMBASSADOR AHMAD HAD APPARENT AUTHORITY

The D.C. Circuit has not decided whether mere apparent authority is sufficient to support a waiver of immunity. *See CapitalKeys*, 2022 WL 2902083, at *3. Other courts have taken diverging approaches. *Compare, e.g.*, *SACE*, 243 F. Supp. 3d at 34-39 (requiring actual authority), *with First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda – Permanent Mission*, 877 F.2d 189, 193-97 (2d Cir. 1989) (apparent authority sufficient); *Restatement (Fourth) of Foreign Relations Law of the United States* § 302(2) (2018) (same).

Given that Ambassador Ahmad had actual authority to waive immunity and that the Government ratified the Loan Agreement regardless, the Court need not wade into the apparent authority dispute. But for completeness, QNB notes that the evidence supports a finding of apparent authority too. The Government clothed Mr. Ahmad with apparent authority to waive immunity by installing him in the office of ambassador – an office that traditionally has authority

to waive immunity.  *See* pp. 6-7, *supra*.  And the Government confirmed his authority by partially performing the Loan Agreement.  *See* p. 8, *supra*.  Thus, unlike in *SACE*, where the president's nephew-in-law "was not a duly-accredited ambassador . . . and was also patently engaged in self-dealing when he made the waiver representation," 243 F. Supp. 3d at 24, Mr. Ahmad ***was*** a duly-accredited ambassador and was engaged in a facially regular public finance transaction.  QNB reasonably relied on his apparent authority.

## IV.    IF THE COURT OVERRULES QNB'S OBJECTIONS, IT SHOULD PERMIT QNB TO FILE A RENEWED MOTION

The R&R "recommend[ed] that the Bank have the opportunity to refile its Motion should it wish to introduce additional evidence in an attempt to meet its burden."  Dkt. 25 at 7.  For the reasons above, QNB's existing evidentiary showing is sufficient, and the Court may consider additional evidence on review of the R&R in any event.  But if the Court disagrees, it should adopt the recommendation that QNB be permitted to file a renewed motion with additional evidence.

QNB would submit with any renewed motion the additional exhibits it is submitting with these objections as well as the Eritrean government publications for which it is requesting judicial notice.  QNB anticipates that it may also submit Eritrean legal expert testimony on the authority of Eritrea's government officials.  QNB maintains that this additional evidence is unnecessary given the existing record, but the Court should grant QNB the opportunity to present additional evidence if the Court would consider it material.

## **CONCLUSION**

The Court should reject the Magistrate Judge's report and recommendation, grant QNB's

motion for default judgment, and enter judgment against the Government and State of Eritrea,

jointly and severally, in the form previously proposed at Dkt. 17-19.


Dated:   May 28, 2025                         Respectfully submitted,
         Washington, D.C.


                                              ___/s/ Robert K. Kry_____
                                              Robert K. Kry
                                              D.C. Bar # 490545
                                              Kenneth E. Notter III
                                              D.C. Bar # 1708367
                                              MOLOLAMKEN LLP
                                              The Watergate, Suite 500
                                              600 New Hampshire Avenue, N.W.
                                              Washington, D.C.  20037
                                              Tel.: (202) 556-2011
                                              Fax: (202) 556-2001
                                              rkry@mololamken.com

                                              *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 28, 2025, the foregoing document and accompanying materials were

served on the Government of Eritrea and the State of Eritrea by U.S. mail to the following:


    Hon. Osman Saleh Mohammed
    Minister of Foreign Affairs
    Ministry of Foreign Affairs
    P.O. Box 190
    Asmara, Eritrea

                                   /s/ Robert K. Kry
                                    Robert K. Kry